### STATE v. AARON WISEMAN.

(Filed 20 December, 1919.)

1. **Removal of Cause—Transfer of Cause—Courts—Discretion—Appeal and Error.**

    The order to remove a cause to another county for a fair and impartial trial is a matter within the discretion of the Superior Court judge, and will not be reviewed on appeal unless plainly arbitrary and oppressive.

2. **Homicide—Murder—Evidence—Capias.**

    Where there is evidence tending to show that the prisoner was guilty of or participated with others who had been previously tried for the same crime, it is competent to show that on the former trial he was com-

pelled to testify under a *capias ad testificandum*, as an unwilling witness, which, though having little weight in itself, was a circumstance to be taken with the other evidence in the case.

**3. Appeal and Error—Contentions—Instructions—Objections and Exceptions.**

Error in the misstatement of the trial judge of the contention of the appellant must be called to the attention of the judge at the time, to afford him an opportunity to correct it, or it will not be considered on appeal.

**4. Homicide—Murder—Burden of Proof—Instructions.**

An instruction upon the trial of a homicide to acquit the prisoner should the jury find the contentions of his counsel to be true, upon all the evidence, is not objectionable as relieving the State of the burden to show guilt beyond a reasonable doubt, when the judge has repeatedly, throughout his charge, emphasized this requirement.

**5. Homicide—Murder—Lying in Wait—Accomplice.**

Upon evidence tending to show that the prisoner singly, or with one or two others, awaited the train on which the deceased was to arrive after nightfall, the darkness increased by mist and clouds, and they or he continued to shoot him to death at close range as he was leaving the train, and went secretly and hastily away: *Held*, whether the prisoner alone, or with others, committed the homicide, the evidence is sufficient to be submitted to the jury upon the question as to whether the prisoner waylaid the deceased, within the meaning of the statute, and, with the other evidence in the case, to sustain a verdict of murder in the first degree.

**6. Homicide—Murder—Identity—Evidence—Questions for Jury—Trials.**

Where the evidence is conflicting as to the identity of the prisoner as the one who had shot and killed the deceased as he was leaving a train on which he had been a passenger, and there is direct and positive testimony of passengers on the coach as to the dress and appearance of the prisoner, seen from the light of the car windows, whose name they did not know at the time, but afterwards definitely knew, and identified, this question of identity is one of fact for the exclusive determination of the jury.

**7. Homicide—Murder—Motive—Evidence—Trials.**

Where, upon the trial for a homicide, there is evidence that the prisoner laid in wait for the deceased and fired upon and killed him, it is unnecessary to separately show the prisoner's motive for the killing by evidence independently directed to it, though such evidence may be a material element for the jury to consider in passing upon the prisoner's guilt, and its absence a circumstance in his favor.

**8. Homicide—Murder—Accomplice—Evidence.**

Where there is evidence tending to show that the prisoner and two certain others were lying in wait to assassinate the deceased, and that they fired ten shots in rapid succession, taking effect and causing death, an instruction of the court to the jury is correct, that if they found the facts accordingly the prisoner would be guilty of murder in the first degree if he was present at the time and acted in concert with and aided and abetted the others therein.

50—178

**9. Homicide—Murder—Evidence—Second Degree.**

> Where the whole evidence tends only to show a murder accomplished by lying in wait and the deliberate and premeditated killing of the deceased, it is not error in the Superior Court judge to fail to submit to the jury any question as to the murder being in the second degree, for the verdict should be either murder in the first degree or an acquittal.

ALLEN, J., dissenting; BROWN, J., concurring in the dissenting opinion.

APPEAL by defendant from *Long, J.,* at May Special Term, 1919, of CLEVELAND.

Verdict of murder in the first degree, and sentence in accordance with law, from which the prisoner appealed.

*Attorney-General Manning, Assistant Attorney-General Nash, and W. A. Self for the State.*

*J. W.·Pless, Lambert & Lambert, Spainhour & Mull, and S. J. Ervin for prisoner.*

CLARK, C. J.   The prisoner was convicted of murder in the first degree of Dr. E. A. Hennessee, who was killed at Glen Alpine, N. C., just after he stepped off the westbound train, No. 21, about 6:30 p. m., 31 January, 1918, 10 bullets in rapid succession being fired at close range into his back and side—7 of them passing entirely through his body. At that point the railroad runs east and west, the station being on the south side of the track.   The passengers on that night alighted from the train somewhat east of the station in the direction of Morganton.   The train was about an hour late.   The evening was overcast, it being warm and misty.   The train arrived about 6:30 p. m., it being deep twilight. Dr. Hennessee was returning to his home at Glen Alpine from a trip to Greensboro.   It seems that he was the first person to alight from the coach in which he was riding.   Almost immediately one or more persons in the darkness opened fire upon him.   There were 10 or 12 shots in rapid succession.   His brother, M. N. Hennessee, who soon arrived on the spot, describes the location of the body as follows:  "His body was 8 or 10, feet east of the platform, his head was towards the railroad, lying a little angling, lying nearly straight, with his feet south or southeast, in the direction of W. D. Pitts' store, which is about 60 feet from the railroad track.   The head of Dr. Hennessee was something like about three feet from the track.   He was lying on his face when I got there."

Dr. T. V. Goode described the wounds as follows:  "He was shot 10 times.   I don't remember how many went through; think it was five, probably.   I'll have to refer to the notes.   There were ten wounds, all entered from the back and side.   I couldn't tell you how many passed completely through the body.   One entered about three inches below the left hip joint in the back of the thigh, ranged downward and to the right,

going through the left thigh at an angle, and through the right thigh, coming out three inches above the right knee cap, and a little to the outside. One entered the left hip four inches behind the joint, towards the median line; didn't come out; I couldn't tell the range of it; one entered four inches towards the median line from that one—that one didn't come out; I couldn't tell the course of that; the next one entered two and a half inches below the crest of the ilium, the hip bone, close to the spine— that didn't come out; that was on the left side; I couldn't tell the course of that; one entered one and a half inches from the spine on the left side, three inches above the angle of the shoulder bone, coming out in front, the left side of the breast bone, at its junction with the first rib. That was all on the left side of the spinal column. On the right side one entered one inch from the spine, two inches above the crest of the ilium, hip bone—that came out in front one and a half inches from the median line, left side, and two inches below the umbilicus (navel), ranging a little bit down; the next one entered four inches below the shoulder, about 5 inches from the spine on the right side, and came out on the left side, ranging almost straight through; the next one entered about the middle axillary line on the right side between the eighth and ninth ribs, ranging probably just a little bit up; next one entered two inches above the angle of the scapula and two inches from the spine, on the right side, and came out the edge of the sternum junction with the second rib, ranging practically straight through; next entered behind the right shoulder, one inch below, came out in front, just below the clavicle, ranging practically straight through." (Witness indicates on body of counsel the location of the wounds).

"I found four of those bullets when I made the examination, and Mr. Hennessee gave me one he had found; that made five that went through. I don't know that there were five that didn't pass entirely through the body; don't know that that is true; some might have been lost that went through. (Witness refers to notes and states that seven went through.) Three did not go through. I found those four that went through lying just inside his shirt; the other Mr. Hennessee said he took out of his tie."

The doctor further stated that practically all the wounds showed more or less powder burns, and that in order to make such burns the pistol would have to be within twenty inches of the victim. The train that night was composed of a combination baggage and passenger car in which the witnesses Ramsey and Amos were sitting, a passenger car immediately behind this, and a chair car at the end.

The conductor, Captain Sumner, was on the front platform of the combination car, while J. F. Laughter had charge of the passenger coach, under whose supervision the passengers got off and on the train.

It appears from the testimony that Dr. Hennessee was the first passenger to alight from the coach; that he walked around the two or three people waiting to get on the train, and started west towards the platform of the station. As soon as he got clear of this crowd, the man or men waylaying him opened fire upon him.

The State's evidence tended to show that the defendant Wiseman was, if not the sole assassin, certainly one of them. He was recognized by J. M. Ramsey as the man who was standing with two pistols in his hand, one a long, blue steel pistol, in one hand, and a nickel-plated one in the other, and he was emptying these pistols into the body of Hennessee as rapidly as he could pull the trigger. He testified:

"I could see a perfect outline of this man, the coat he had on, the pistols he had in his hands—had a blue pistol in one hand and a nickel-plated one in the other; had on a coat, just like a tan-colored raincoat, tan coat, which I could see very plainly; came between his knees and his shoes, about half way between his knees and the ground." And further on: "I couldn't tell the color of the hat he had on. It was a broad-brimmed hat. I didn't know who the man was at that time. I know now. It was Aaron Wiseman."

Fred Amos also recognized him: "On the 31st of January I was on train No. 21, the same train Mr. Ramsey was on; I was on the left side of the coach, next to the station at Glen Alpine, going west. I was about two or three seats in front of Mr. Ramsey. When the train stopped at the station at Glen Alpine, it hadn't stopped over 30 seconds, and I was attracted by what sounded like fire-crackers or shooting; at the same time cinders hit my window, and I turned in my seat, put my hand up and tried to raise the window at the same time, and I couldn't raise it, so I looked out and looked back this way at an angle and I saw a man with two pistols, shooting; one was a light pistol, looked like it was nickel-plated, and the other was a blue steel, I suppose. He was standing looking right down this way, he was slightly bent, and shooting down, looked like, under the train. That man had on a light-colored slouch hat and tan-colored raincoat or slicker of some sort; looked like it struck him below his knees—I didn't pay any great deal of attention to it.

"I know who the man was that I saw doing the shooting; it was Aaron Wiseman; I haven't the least doubt about it in the world; if I had any doubt I certainly wouldn't swear it. This defendant is the man I saw doing the shooting."

About the accuracy, reliability, and character of these two witnesses nearly all the other testimony in the case clustered: The State on the one hand introducing testimony to corroborate their statements, while the defendant, on the other hand, introduced evidence which tended to disparage and contradict those statements. The issue of fact thus made

was passed upon by the jury. This Court reviews only alleged errors of law, or legal inference, committed by the judge, and we need not take time and space to analyze and discuss this testimony, whose admissibility was not excepted to.

The prisoner's first exception is to the order of removal from Burke to Cleveland County. This Court has always held that such order is a matter of discretion, and will not be reviewed unless plainly arbitrary and oppressive, which is not shown in this case. *S. v. Hayes Baldwin, ante,* p. 687.

Exceptions 2, 3, 4, and 5 are to the admission of testimony in regard to the prisoner's failure to attend court as a witness at the trial of the two Pitts boys for the murder of Hennessee, and that a *capias ad testificandum* had been necessary to compel his attendance, and of the service of that *capias* on him by the officers. The Pitts had been tried the year previous for the murder of Dr. Hennessee, and were acquitted. The evidence objected to was competent to show that the prisoner was an unwilling witness at that trial, and, while of little weight in itself, was a circumstance which the State was entitled to have submitted.

Exceptions 6 to 19, inclusive, are to the recital by the court of the contentions of the State, and upon examination we cannot find error therein. It was incumbent upon the prisoner to call any alleged error in such recitals to the attention of the court at the time. *S. v. Caylor, ante,* p. 807.

Exception 20 is to a paragraph in the judge's charge when, after stating the contentions of the prisoner's counsel, he said: "If you find from the examination of all the evidence in the case that these contentions of the prisoner's counsel are true, you will acquit him." The able and experienced judge, however, both before and after this statement, repeatedly stated to the jury that "the burden was upon the State to satisfy the jury beyond a reasonable doubt." This is often repeated and the jury could not by any possibility have understood this clause as being in any way in conflict with the well settled principle which he so often stated in the charge.

Exceptions 21, 22, and 23 were to the judge's charge defining "lying in wait," which was as follows: "When our statute speaks of murder perpetrated by lying in wait, it refers to a killing where the person who does the killing has stationed himself for private attack, or one who is lying in ambush for private attack. While being in ambush and concealed, watching and waiting for a victim, would comprehend what is meant by lying in wait, still it is not necessary for the assailant to be actually concealed. If he placed himself in a position so as to make a private attack upon his victim, so as to assail him, under circumstances when the person assailed did not know of his presence, or of his purpose,

and in the darkness of the night, or when the ordinary darkness was obscured by clouds and mist, and under such circumstances when he makes a secret assault upon the person assailed and shoots and kills him, and flees without a disclosure of his identity—a killing under these circumstances would constitute a waylaying within the meaning of the statute."

This was in entire accord with all our authorities, *S. v. Walker,* 170 N. C., 716; *S. v. Bridges, ante,* p. 733. The evidence was uncontradicted that Dr. Hennessee, almost immediately on getting off the train, was fired upon by one or more persons, at short range, all the shots striking him in the back or in the side. The parties were evidently in wait for their victim, and whether one man alone did the firing, and one or two others were present, by a reasonable inference from the evidence, to point him out, or to keep the crowd off till their victim was slaughtered, or whether one man alone did the shooting; in any event, the killing, in any aspect of this case, was an assassination by lying in wait, and by taking the victim unawares without opportunity to defend himself. The chief, if not the only question in the case upon this evidence was as to the identity of the murderer, or murderers, who committed the act, and that was for the jury, upon the evidence, and was fully and earnestly argued to them by the many able counsel who represented the prisoner.

That the slaying was by lying in wait, is beyond question. The only question presented in this record is whether there was legal error committed in the trial, in which the jury found beyond a reasonable doubt the identity of the slayer with the prisoner.

The argument on behalf of the prisoner in this Court was almost entirely expended in urging that upon the evidence the prisoner should not have been convicted, but that is a matter which the jury was to decide, and as to which they were unanimous that there was no reasonable doubt of the guilt of the prisoner. There were two eye-witnesses, who testified that they saw him in the act of shooting Dr. Hennessee, and that there was no doubt of his identity. As to the claim that he could not have gotten on the train after the shooting, Pink Rabb, a witness for the prisoner, who was stated to be "a highly respectable man," testified that he had known Aaron Wiseman for several years, and that he came into the coach in which Rabb was sitting, who went up and sat down by him and talked to him. Rabb says: "When he came in the firing had ceased."

We do not find the claim that the judge committed errors in reciting the testimony sustained by an examination of the record, but if it had been it was waived by the prisoner, being contented with it at the time, for he made no objection when the judge would have corrected the

error, if any, if called to his attention. This has often been held, and has been repeated at this term in *S. v. Caylor, ante,* p. 807, citing authorities.

The charge of the judge in regard to motive was correct. He said, giving the whole paragraph: "With regard to the question of motive for the commission of crime, the court further instructs you that if the evidence in this case fails to show the prisoner's motive for killing the deceased, this is a circumstance in his favor, which the jury should consider along with the other evidence, but if the jury finds, from all the evidence, direct and circumstantial, that the prisoner committed the crime charged, the jury are at liberty to find the prisoner guilty, whether any motive was apparent or not, because, while motive in the commission of a crime is a material element for a jury in considering it, yet if it is shown beyond a reasonable doubt that the crime was committed, it is not indispensable that the motive should be apparent to sustain a conviction."

In *S. v. Adams,* 138 N. C., 688, it was held: "The existence of a motive may be evidence to show the degree of the offense, or to establish the identity of the defendant as the slayer, but motive is not an essential element of murder in the first degree, nor is it indispensable to a conviction, even though the evidence is circumstantial," *Walker, J.,* saying (at p. 697): "It is not required that a motive should be shown under the circumstances required in the prayer. When the evidence is circumstantial, the proof of a motive for committing the crime is relevant, and sometimes is important and very potential, as it may carry conviction to the minds of the jurors, when otherwise they would not be convinced. This is all that is meant by the Court in the cases cited by counsel. *S. v. Green,* 92 N. C., 779. Murder may be committed without any motive. It is the intention deliberately formed, after premeditation, so that it becomes a definite purpose, to kill, and a consequent killing, without legal provocation or excuse, that constitutes murder in the first degree. The existence of a motive may be evidence to show the degree of the offense, or to establish the identity of the defendant as the slayer, but motive is not an essential element of the crime, nor is it indispensable to a conviction of the person charged with its commission. *S. v. Wilcox,* 132 N. C., 1143; *S. v. Adams,* 136 N. C., 620."

Garfield Pitts and Aaron Pitts had been acquitted of the assassination of Dr. Hennessee, and being thus protected, it was perhaps not unnatural that the prisoner on this occasion endeavored to show that they were the guilty men, but the jury believed the testimony of the two eye-witnesses, Ramsey and Amos, who were sitting inside the coach, and by the light thrown from the lamps therein could see the man who was doing the shooting better than those outside in the dark.

They testified positively that they saw the prisoner a few feet away when, with a pistol in each hand, he was shooting Dr. Hennessee, and there was also evidence that shots were fired into Hennessee's body after he was lying on the ground. There was evidence introduced by the prisoner tending to show that Garfield Pitts and Aaron Pitts were there at the time, and that after the killing they went over to W. D. Pitts' store. This in nowise contradicts the testimony of Ramsey and Amos that Wiseman was shooting Dr. Hennessee with two pistols, and that they recognized him. The testimony offered by the prisoner shows that the two Pitt boys were there. If they were co-operating with Wiseman in the assassination, and even if they also shot Hennessee when, from their position in the car, the witnesses, Ramsey and Amos, may not have been able to see them, this would in nowise lessen the guilt of the slayer, whom these two witnesses identified as Wiseman, and whom the jury believed.

There was much evidence, besides that offered for the prisoner, that the Pitts boys were present with Wiseman, to show coöperation. Wiseman lived in Avery County, some 30 or 40 miles from the scene of the assassination at Glen Alpine, yet 6 or 8 weeks before the murder of Dr. Hennessee, he was on his way to see W. D. Pitts, and so anxious to see him that night that Loven testified that he told him at Marion that if he missed the train he would hire an automobile. He was at Marion that afternoon just before the killing, with two pistols on his person, one of them large, and the other not so large, corresponding with the description of them by the two witnesses, who saw them in use when he was killing Dr. Hennessee. On his arrival at Glen Alpine he went direct to W. D. Pitts' store, where he got the cartridges. According to the testimony of the prisoner's own witnesses, he was at the place of the assassination that night, accompanied by one or both of the Pitts boys. He claims that after the killing he ran to the end of the train, trying to get on it, and then came back with two drummers to the entrance of the car where the body was lying, and that he got on the train at the same time they did, but one of these drummers (Stafford) testifies that he did not get on with them. Later, when subpœnaed as a witness for the State at the trial of the Pitts boys, he refused to appear and testified until arrested on a *capias*. After he was arrested and in jail he told E. A. Green: "I want you to phone for Bud Pitts (W. D. Pitts) to come down here at once," according to Mr. Scott's testimony.

It is not necessary to recapitulate the testimony, for that was a matter for the jury, and was ably presented to them by the numerous, zealous, able, and experienced counsel of the prisoner, one of whom had previously represented the prosecution on the trial of the Pittses,

and therefore knew the evidence on both sides thoroughly, and could use it to best advantage.

It might be added that Sam Byrd and Jasper Reap, witnesses for the defendant, testified that they saw two men shooting at Dr. Hennessee on that occasion, but it was so dark that they could not recognize their faces. Byrd says he saw them turn to the body of the man and shoot him after he had fallen, and that one of the men went in the direction of Pitts' store. And he knows that he was one of the men that did the shooting. And he saw another man join him at the store, but he is not certain that he was one of those who fired; that he could not recognize the faces of either of the men. Reap says he did not know who was doing the shooting, but there were two men, and that after the shooting two men went towards Pitts' store. W. A. McSherry testifies that he was in the coach with Ramsey and Amos, but on the north side, and when the firing began he crossed over to the south side and saw one man shooting, with two streams of fire about 12 or 18 inches apart. From where he was in the coach it seems that by the light of the lamps he, like Ramsey and Amos, could see one man shooting distinctly, whereas, the witnesses outside in the dark could not do so. McSherry says that the man doing the shooting wore a tan colored coat.

On an occasion of this kind, when there was great confusion, there would naturally arise some conflict as to details, but in this there is nothing that contradicts the witnesses who say that they recognized the prisoner as the man they saw doing the shooting.

By the light from the car, the three men inside could see, and they testified that they saw distinctly one man in a tan coat firing, and two of them testified positively that the prisoner was that man. From their position they could see, it seems, only one man firing. The witnesses in the dark outside saw evidently objects below the window, shrouded in the darkness, for they did not recognize the faces of the two men whom they saw shooting, as they say, but this does not tend to contradict the evidence that the prisoner was shooting Hennessee, firing two pistols at close range. He may have had one or more coöperating with him, according to the testimony for the prisoner.

The charge of the experienced and able judge has been closely scanned, and we find it a clear and correct statement of the law applicable, and entirely fair to the prisoner and instructive to the jury in their search for the truth.

The remaining exceptions of the prisoner are to those parts of the charge which instructed the jury that if they were satisfied beyond a reasonable doubt that the prisoner was present, aiding and abetting Garfield Pitts and Aaron Pitts in the assassination of Dr. Hennessee, they should convict him of murder in the first degree.

STATE *v.* WISEMAN.

The instructions to the jury on this point were as follows: "You are further instructed that, although you may find, as has been argued by counsel on both sides, that Garfield and Aaron Pitts assaulted Dr. Hennessee, and participated in the killing of Dr. Hennessee, and were afterwards tried in Burke Superior Court, and acquitted by a jury in Burke County, this would not be a bar to the prosecution of the prisoner in this case. Independent of what was the result of the trial in Burke County in the case of *S. v. Garfield Pitts and Aaron Pitts*, if the State has furnished you evidence in this case now on trial which convinces you beyond a reasonable doubt that this prisoner waylaid and deliberately shot and killed Dr. Hennessee, either alone or in concert with Garfield Pitts and Aaron Pitts, or both, he would be guilty of murder in the first degree, and you will so find. Or if you find that Garfield Pitts or Aaron Pitts, or both, waylaid and deliberately and with premeditation shot and killed Dr. Hennessee, and you also find beyond a reasonable doubt that the prisoner was present at the time, acting in concert with the person or persons waylaying and deliberately killing Dr. Hennessee, the prisoner, if he so acted in concert, would be guilty of murder in the first degree."

The following is the conclusion of the judge's charge, which evinces a careful and conscientious desire to be fair and just to the prisoner. He said: "It is the duty of the jury to determine carefully, upon all of the evidence as stated by the witnesses, whether the incriminating facts and circumstances from which they may infer guilt are proved beyond a reasonable doubt. The court cannot express an opinion to you as to what weight you shall give to the direct testimony of eye-witnesses, or to the testimony of a witness who testified to the circumstances, or to the testimony of any witness. This devolves on the jury, and they have that sole responsibility to hear the evidence, consider it, and find the facts from it as it may or may not address itself to their conviction. While the court cannot intimate in the slighest degree what weight you should give to the testimony of any witness, and does not do so, it is proper to call your attention to the fact that in weighing the testimony of a witness the jury has the opportunity to see the witness on the stand, and to observe his demeanor on the stand; in weighing his testimony the jury may also consider his mental capacity to comprehend the facts to which he is testifying, or his lack of mental capacity; also whether he had a good opportunity to observe and to know the particular facts to which he testifies, or the reverse; whether the memory of the witness appears to you to have been good, or the reverse; whether the character of the witness is good or bad; whether the witness is shown to have any motive whatever to misrepresent what he states, or whether he is shown to have been without prejudice or passion, and

without private or personal interest to advance; whether his narration of the incidents is consistent with the main facts shown, or is borne out by other circumstances; whether his testimony is supported by concurrent or correlated testimony and circumstances, or whether his testimony is contradicted by other witnesses, or by circumstances shown in the case.

"These cautionary suggestions made to the jury by the court are made only for the purpose of indicating to you some of the elements of probability or improbability as affecting the proof of facts and circumstances, but as I have stated to you, not for the purpose of in anywise intimating to you anything whatever as to the weight which you shall give the testimony of any witness.

"As I have stated to you heretofore, to justify a conviction of the prisoner you must be satisfied of the truth of the charge beyond a reasonable doubt. A reasonable doubt is not a mere whim or surmise, or conjecture, or a capricious speculation, or captious doubt arising from something extraneous to the evidence in the cause, but a reasonable doubt is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the mind of the jury in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge.

"With the instructions given, if you are satisfied beyond a reasonable doubt of the guilt of the prisoner, as contended for by the State, your verdict will be guilty of murder in the first degree, as charged in the bill of indictment. But, on the contrary, if you have a reasonable doubt of the guilt of the prisoner, upon all of the evidence, your verdict will be 'not guilty.' "

One of the counsel for the prisoner, in the oral argument in this Court, suggested that the judge should have submitted to the jury the phase of murder in the second degree. The able and learned counsel for the prisoner took no such exception, and there was nothing to justify it, if it was before us for discussion. There was no question that Dr. Hennessee was shot down in the deepening twilight, just after he had gotten off the train, and was killed by some person or persons the muzzle of whose pistol or pistols were within 20 inches of his body, and that he was shot in the back and side, and in all received 10 bullets in his body. There was no evidence of provocation, or of an altercation, or of self-defense. The whole evidence showed a premeditated assassination by one or more persons. The question before the jury below was almost solely as to the identity of the prisoner as the man who shot him, or who was present, aiding and abetting those who did. It was one of those cases in which there was no doubt as to the manner of the killing, and the court might well have charged the jury, though it did not do so, that

STATE v. WISEMAN.

"the prisoner was guilty of murder in the first degree or nothing." This would have been strictly in accordance with the testimony, and numerous precedents. *S. v. McKinney*, 111 N. C., 684; *S. v. Cox*, 110 N. C., 503; *S. v. Byers*, 100 N. C., 512; *S. v. Jones*, 93 N. C., 611, and numerous others.

The testimony as to the identity of the prisoner is lengthy, and was ably and fully argued to the jury, who found it sufficient to satisfy them beyond a reasonable doubt that the prisoner was the guilty man. It can serve no purpose to repeat and consider the weight which should be given to the evidence. This was a matter for the jury, and was amply sufficient to be submitted to them, together with the evidence which the prisoner contended should cause them to have a reasonable doubt as to his identity. The argument here for the prisoner was almost entirely that which must have been admitted to the jury, as to whether the evidence should convince them of the identity of the prisoner as the man who slew Dr. Hennessee, or who was present, aiding and abetting those who did. The only evidence excepted to, as above stated, was as to the pertinency of the evidence as to procuring the attendance of the prisoner when summoned as a witness on the trial of the two Pittses for the year before for the murder of Dr. Hennessee.

Our province is not to review the evidence and determine how far the jury was warranted thereby in finding beyond a reasonable doubt the identity of the prisoner as charged in the bill of indictment. It is for us to consider only the errors of law assigned, and after a careful consideration we find therein

No error.

ALLEN, J., dissenting: If I did not have grave doubts of the guilt of the defendant, and did not think there was serious prejudicial error in the instructions to the jury, I would acquiesce in the judgment of the court, because it is unfortunate to have a sentence of death affirmed by a bare majority vote, but, entertaining the views I do, I must give expression to them, and in order that the materiality of the instructions, which I think are erroneous, may be understood and appreciated, it is necessary to review the evidence.

Dr. Hennessee was killed on the night of 31 January, 1918, as he alighted from the train at Glen Alpine. The train was an hour late, and did not reach the station until 6:30 o'clock. It was deep twilight and warm and misty. Dr. Hennessee, one other man, and two ladies left the train.

There is not the slightest evidence or suggestion of any motive on the part of the defendant to kill the deceased, nor does it appear that he had ever seen him before the night of the killing (they lived thirty or forty

miles apart), but, on the other hand, there was a keep hatred existing between the Pitts family and the deceased, because Dr. Hennessee had killed one of the family about five years before.

Mr. Hennessee, a brother, testified: "My brother had had trouble with the Pittses; had a fight there about five years before.

"Q. Gorman Pitts was killed in that trouble? A. He died afterwards in consequence of the wound—wounded and died. That was a fight between my brother and the Pittses. Five years before this, I believe. My brother had been indicted and tried for the murder of Gorman Pitts, and he was acquitted. Then later he was killed, and this indictment was against Aaron and Garfield Pitts.

"Q. You do know that there was very bad blood between the Pittses and your brother. A. Didn't seem to do any business at all; they didn't have any dealings with each other; didn't speak when they would meet in the road; that had gone on for a number of years.

"I suppose there was a bitter feeling between them. That there was really a feud between them was talked in the country."

There is no evidence that any one was standing near enough to the person who did the shooting to point out Dr. Hennessee as he left the train.

Why, then, should the prisoner, without provocation, kill a man he did not know, and why did he shoot Dr. Hennessee, whom he had never seen, instead of the other man, who got off the train immediately behind him?

The only witnesses relied on by the State to identify the defendant as the guilty person are Ramsey and Amos, and without their evidence the verdict could not be permitted to stand.

Both of these were on the train, and were looking through the window glass.

Ramsey testified, among other things: "Just as the train stopped, about the time, I heard a shot; as I heard it I put my eyes up to the window and looked out; as I did I could see a man's face just in the shadow of the light; you know how the light comes down out of the train, wide at the bottom and comes up narrow through the window; I could see a man about 15 feet from me, and something like 12 or 15 feet from the train, almost at an angle of 45 to 60 degrees, out from me to the train, and as he approached he shot just as fast (indicating), bang, bang, bang, bang, just like that; I saw some one right out of the door; couldn't tell whether it was a man or who it was, or whether they ran forward, backward or down, but as this man continued to shoot, he came towards the train round towards my window, he appeared to be shooting under the train; and as he finished shooting he was in the light, plain up right along his neck, between his chin and his shoulders; I could see a perfect outline of this man, the coat he had on, the pistols he had in his hands—

had a blue pistol in one hand and a nickel-plated one in the other; had on a coat, just like a tan-colored raincoat, tan coat, which I could see very plainly; came between his knees and his shoes, about half way between his knees and the ground. I couldn't see whether he had on his shirt, and couldn't see his face for his hat; if I had known the man I could have told who he was very easily, but not knowing him I couldn't. Just as he finished shooting he commenced to snap the pistols, and I ran to the door of the train to get out, and the officer of the train said, 'You can't get off,' reached up to pull the bell cord, and I went back to my seat, and put my hands up and looked out, and as the train was moving off that man was still standing there where he was when I left the seat to go back to the door. I couldn't tell the color of the hat he had on; it was a broad-brimmed hat. When I put my hand up to the glass to look out I could tell perfectly plain what was taking place on the outside. I didn't know who that man was at that time. I know now. It was Aaron Wiseman."

There are six statements to be noted in this evidence: (1) That the man who shot was 15 feet from the witness, and 12 or 15 feet from the train; (2) that he held a pistol in each hand; (3) that the witness couldn't see his face for his hat; (4) that only one person, and not one or more, was shooting; (5) that after the shooting ceased the witness went to the rear door of the coach to get out, and when he was not permitted to do so he returned to his seat, and the man who did the shooting was still standing there, and the train was moving; (6) that he says he "could tell perfectly plain what was taking place on the outside."

There is evidence of the good character of this witness, but he stands discredited on the record.

He testified: "I had never seen Wiseman before. I recognized Wiseman as the man that did the shooting on the day he was a witness in the Pitts' case. He was on the other side and I was for the defense; when he walked on the witness stand I recognized him, the outline of his body, the movement as he walked. On that I swear that is the man, just as positive as I am that I am sitting here."

Passing by any discussion of the character of a witness, who, when human life is at stake, will identify so positively a person whom he had never seen before, and when the only marks of identity were "the outline of his body, the movement of the body," the witness was examined as a witness in behalf of the Pitts boys, who were on trial charged with the murder of Dr. Hennessee, and he did not then tell on the witness stand that Wiseman was the guilty party, although the disclosure, if true, would have resulted in their acquittal.

There is evidence that he told one other of his recognition of the defendant; also one of the counsel for the Pitts boys, but the last is con-

tradicted, and does not seem to be reasonable, as no counsel would fail to avail himself of so important a fact in defense of a client on trial for his life.

The witness was on the second-class coach, and he testified that he went to the rear platform *after the shooting,* and then returned to his seat, and the man was *still standing there* and the train *moving.*

He also testified: "I went to the door of the rear of the coach; the officer of the train met me at the door of my coach, and I said, 'Let me get out, Cap,' and he said, 'You can't get out; going to pull out,' and he reached up and pulled the bell cord, and as he did that I ran back to my seat. I think he closed the door. I said he was closing the door."

Laughter, the flagman of the train, testified: "Two doors of that train were opened that night, the front end of my car, first-class car, and the front end of the second-class car; the second-class car was the next in front of me. No door was open behind the door I had charge of."

This evidence of the flagman is uncontradicted, and it shows that only two entrances to the train were open, one behind the witness Ramsey at the front of the first-class car, and one in front of the second-class car.

It is also corroborated by the evidence of J. E. Stafford, a witness for the State, who, with another commercial traveler, Kelly, was at the station to take the train. He says: "As Dr. Hennessee stepped down and walked around the shooting began, and I said to Mr. Kelly, 'Let's run to the other end and get on,' and we did, and the train began moving, and Mr. Kelly said, 'Let's go back up and get on,' and I ran back up and jumped on the train right over Dr. Hennessee's head." Also, "I got to the chair car when the train started, and I saw it was locked and I turned and ran back to the first-class car. I knew I was the last man that went in at that door because the flagman had my suitcases and I talked to him, and he closed the door."

The evidence of Ramsey, if believed, establishes the fact that the entrance to the first-class car was closed before he returned to his seat, and he does not say any one passed his line of vision going to the platform of the second-class coach. On the contrary, he says "the train was not going five miles an hour; couldn't have moved more than ten feet until he was out of my vision," and if this is true, and the door of the first-class car was closed, the man who did the shooting was left at Glen Alpine, and did not enter the train. He could not have gotten on the chair car, because Stafford swears the door of that car was locked.

And still there is no denial of the fact that the defendant Wiseman was a passenger on the train that night from Glen Alpin to Marion.

The ticket agent swears he sold Wiseman a ticket about 5:30 o'clock. Mr. Rabb, a witness of high character, testified as to what occurred at Glen Alpine: "I saw Aaron Wiseman that night in the coach I was in;

he came in and sat down on the first seat; he came in while the train was there. I went up and talked to him a little; sat down by him. I had known him a few years before that. When he came in the firing had ceased. I don't remember how many drummers came in with him; two drummers came in. I don't know how far he rode on that train; I went to Marion. I couldn't tell you whether Wiseman came in when the train was in motion or before it started"; and W. M. Ramsey, who lives at Marion, testified that the defendant spent the night of the killing of Dr. Hennessee at his home.

The witness Amos, who was two or three seats in front of Ramsey, testified that he knew the defendant, and that he was the man who killed Dr. Hennessee.

There was evidence of his good character; and also evidence that his character was bad.

He admitted that so far as he knew he was the only one who recognized Wiseman; that he knew the Pitts boys were in jail, charged with the murder; that they were on trial for their lives, and still he did not tell any one that Wiseman was the guilty party until eleven months thereafter.

He also testified: "I recognized Wiseman. The train didn't have to move much to get him out of my sight; I was looking out of the window; I didn't get out of my seat; he was still standing there the last time I saw him."

It thus appears that both Ramsey and Amos, without whose testimony the State could not ask for a conviction, leave the man who did the shooting standing still at Glen Alpine when all the doors of the train were closed; that he passed out of their vision as the train moved forward; and the evidence shows conclusively that the defendant Wiseman was then on the train.

The least that can be said is that these witnesses were mistaken.

There are other remote circumstances relied on, but the case of the State must stand or fall on the evidence of these two witnesses, which shows, if it can be relied on at all, that *one* man, and not two or one or more, killed Dr. Hennessee.

The defendant introduced Sam Byrd, who was proven to be of good character and not related to the defendant, who testified: "When 21 stopped at the station I was standing on the east end of the platform of the depot. I saw Dr. Hennessee; he stepped from the train and started towards me.

"When the train stopped I was about the first besides those that alighted from the train. He started towards me and I started towards him; we had made to or three steps towards each other; were between 10 and 15 feet from each other, and two men appeared from behind Dr. Hennessee

and began shooting; they fired, I would say, four or five shots, and there was a pause, and, seemingly, they turned apart of the way around as though they were going away, and suddenly turned back and began firing again; two men were shooting; they turned to the body of the man which was lying on the ground at that time, and fired several more shots, possibly five or six other shots; and when they ceased firing they turned and left the body; one of the men went around in a circle towards me, and went in the direction of W. D. Pitts' store, which is just south of the train and the station, just below the dirt road; the other man started back the other way, around the crowd, and just about the middle of the public road the two men came together and continued in the direction of W. D. Pitts' store; the last I saw of the men was just about two or three steps of W. D. Pitts' store door.

"Just as the men that did the shooting came right up close to the body, in hand-reach of Dr. Hennessee, they appeared from the darkness behind; I couldn't see where they came from. Both parties were shooting at the same time. The men were side by side, as close as two men could stand, as well as I could see."

Note, according to this evidence, (1) two men did the shooting; (2) they were in "hand-reach" of Dr. Hennessee; (3) after the shooting they went to the Pitts' store, and neither got on the train.

Jasper Reap, who was standing by Byrd, testified: "When the train stopped the shooting commenced, and they shot gravel in my face. I don't know who was doing the shooting; two people were shooting when I saw them; shooting at Dr. Hennessee. At the time the shooting began Dr. Hennessee was 12 or 15 feet from me, east from me. When they began to shoot at him I reckon he was 8 or 10 feet from the side of the coach. The two men shooting at him looked like tall, slim men; one stood pretty close to his feet, and the other about four feet from him.

"Q. How close behind Dr. Hennessee? A. Right at his feet. I couldn't tell how many times they shot; I suppose two rounds of shot—about ten shots, I suppose. The shooting was so fast you couldn't tell much about it, both guns firing the same time. These two men shooting were about four feet apart, and close to Dr. Hennessee. When the shooting stopped the two men turned and walked off towards W. D. Pitts' store."

Miss Ellen Trexler, who was a passenger on the train, testified: "When the train stopped at Glen Alpine Dr. Hennessee got off first, Lum Branch followed Dr. Hennessee, I followed Lum Branch, and then Miss Smathers followed me—that is all that got off of that car. I heard some shooting. When I heard the first shot I was coming out of the train, just before I got to the door. Just as I got to the last step the last shot was fired, and I saw two men run towards W. D. Pitts' store, and then

I' went home. I left the station before the train did. I just saw one shot. Just directly after the last shot was fired the two men left going towards Pitts' store. The men I saw shooting went towards Pitts' store. One was wearing a long black slicker or raincoat, and had a hat pulled down over his face; I couldn't tell how the other was dressed."

Patton, the railroad agent, said he heard the shooting, and "went out there and two men were standing there—Sam Byrd and Jasper Reap—and I asked who got killed, and they said they didn't know, but said the ones that killed him went towards W. D. Pitts' store, in that direction; then I went immediately down to the store; I went pretty fast; trotted down there, run, I think; I pushed on the door and tried to get in, and it was fastened on the inside, and I couldn't in; there was a dim lamp light in the store; then I looked in the window and seen Garfield Pitts with a pistol in his hand like that (indicating); it was a bright-looking pistol; looked like a large pistol; it was pointed directly towards the door."

J. F. Stafford, a witness for the State, who boarded the train at Glen Alpine, testified: "Dr. Hennessee had walked five of six or eight feet before the shooting began, it began firing as he was back of me, five or six feet. I saw the flash from two guns. I thought two men were using them. The men I thought had done the shooting walked from the depot towards W. D. Pitts' store; were 30 or 40 feet from the train; it seems they were near the steps of the little porch."

Dr. Goode, who examined the body of the deceased, testified that the shot entered the back and side; that nearly all had powder burns, and that a pistol would have to be held within 16 or 20 inches of the body to make such burns.

These are the material parts of the evidence, and, to my mind, they present two questions for the jury: (1) Are you satisfied beyond a reasonable doubt the defendant killed the deceased? (2) If so, are you satisfied beyond a reasonable doubt the killing was with premeditation and deliberation?

But counsel for the State saw in these two simple questions not only the possibility, but the strong probability of an acquittal, so they evolved the theory of a conspiracy between the defendant and the Pitts boys, and in response to this position of the State, his Honor charged: "If you find, however, that when Dr. Hennessee alighted from the railroad train he was assaulted with pistols from behind or on the side, by Garfield Pitts and Aaron Pitts, and that the Pitts boys, one or both, deliberately and premeditatedly shot and killed Dr. Hennessee, and you further find that the prisoner, Aaron Wiseman, was at the time in company with and in the presence of the said Pitts boys, and that he was actually coöperating with them, or aiding, abetting, and encouraging them in deliberately

shooting and killing Dr. Hennessee, the prisoner, under such finding by you, would be guilty of murder in the first degree."

This was repeated several times, and doubtless brought about the conviction of the defendant, and it is not only contradictory of the evidence of the State, that one man did the killing, but it has no evidence to support it.

The learned counsel for the State undertake to enumerate all the circumstances tending to show a conspiracy as follows:

"The defendant Wiseman lived in Avery County, some 30 or 40 miles from Glen Alpine, yet we find him six or eight weeks before the murder of Dr. Hennessee, on his way to see W. D. Pitts, and so anxious to see him that night, that, if he missed the train, he would have to take an automobile. We find him at Marion the afternoon before the killing that night before 12 passed the town, with two pistols on his person, one of them large and the other not so large. We find him, on his arrival at Glen Alpine, going direct to the W. D. Pitts' store, where he got cartridges. We find him, admittedly, at the place of the killing that night, accompanied by one or both of the Pitts boys. After the killing we find him claiming to have run to the end of the train trying to get on it, and then coming back with two drummers to the entrance where the body was lying, and getting on the train at the same time that they did; yet we find one of these drummers, J. F. Stafford, testifying that he was not with them when they got on, and that he would have known it if he had been. We find him later, after he had been subpoenaed as a witness for the State, at the trial of the Pitts boys, refusing to appear and testify until after he was arrested under a *capias*. We find him after he was arrested and in jail telling Mr. F. A. Green, 'I want you to phone for Bud Pitts (W. D. Pitts) to come down here at once.' "

This enumeration shows the straits to which the State is reduced to furnish evidence of a conspiracy.

If we eliminate "Yet we find," "so anxious," which are but the inferences of counsel, the statement that the defendant was at the station, "accompanied by one or both of the Pitts boys," which has nothing to sustain it except evidence that all were at the station, and the circumstances of having pistols at Marion, claiming to have run to the end of the train to get on when others testified he did not do so, and failing to appear as a witness against the Pitts boys, which may tend to show guilt, but not a conspiracy, we have nothing except that six or eight weeks before the killing the defendant said he was going to see W. D. Pitts, and if he missed his train he would hire an automobile; that on the evening of the killing he went to the Pitts store and bought cartridges; that he stayed awhile by the fire; that he left and went to the depot; that Garfield and Aaron Pitts were at the depot, as were four or five others, and

that after his arrest he asked some one to phone for W. D. (Bud) Pitts; and there must be still further elimination of circumstances, because W. D. Pitts lived a mile from Glen Alpine, and there is no evidence that he was in the town the evening of the killing or that the defendant saw him.

The evidence of a conspiracy then comes to this, that the defendant went to the Pitts store and bought cartridges; that he stayed some time by the fire because the train was late, and there was no fire at the depot; that he left the store to take his train; that Aaron and Garfield Pitts also went to the train, and upon this he is told that if Aaron or Garfield or both killed Dr. Hennessee he must suffer electrocution.

Upon the same theory I do not see how the two drummers, who took the train at Glen Alpine that night, have escaped as they were doubtless in the Pitts store, and they were at the train with Garfield and Aaron Pitts.

As I understand the record, the instruction is erroneous, because there was not only no evidence to support it, but the circumstances rebut the idea of a conspiracy. The visit to W. D. Pitts six or eight weeks before is fully explained, but without explanation nothing criminal is shown, and the fact that the defendant was proclaiming that he must see Pitts that night; that he sat openly in the Pitts store on the evening of the killing, tend to show that there was no conspiracy.

Again his Honor charged the jury: "With the instructions given, if you are satisfied beyond a reasonable doubt of the guilt of the prisoner as contended for by the State, your verdict will be 'guilty of murder in the first degree, as charged in the bill of indictment.' But, on the contrary, if you have a reasonable doubt of the guilt of the prisoner, upon all of the evidence, your verdict will be 'not guilty,'" to which the defendant excepted, thus preventing the jury from considering murder in the second degree, and this is error if there is evidence of murder in the second degree.

"Where the evidence tends to prove that a murder was done, and that it was done by means of poison, lying in wait, imprisonment, starving, torture, or which has been committed in perpetration, or attempt to perpetrate, any arson, rape, robbery, burglary, or other felony, and where there is no evidence, and where no inference can fairly be deduced from the evidence of or tending to prove a murder in the second degree or manslaughter, the trial judge should instruct the jury that it is their duty to render a verdict of 'guilty of murder in the first degree,' if they are satisfied beyond a reasonable doubt, or of 'not guilty.' If, however, there is any evidence, or if any inference can be fairly deduced therefrom tending to show one of the lower grades of murder, it is then the duty of the trial judge, under appropriate instructions, to submit that view to

the jury. It becomes the duty of the trial judge to determine, in the first instance, if there is any evidence or if any inference can fairly be deduced therefrom, tending to prove one of the lower grades of murder. This does not mean any fanciful inference tending to prove one of the lower grades of murder; but, considering the evidence 'in the best light' for the prisoner, can the inference of murder in the second degree or manslaughter be fairly deduced therefrom." *S. v. Spivey*, 151 N. C., 685.

The question is not whether there is evidence of murder in the first degree, which I concede, but is there any evidence of murder in the second degree, and this depends on whether, "considering the evidence in the best light for the defendant," the inference can be fairly deduced that the murder was not done by one "lying in wait," or stated, perhaps, more accurately, is there any inference that can reasonably be drawn from the evidence except that the person who killed Dr. Hennessee was "lying in wait," which, " 'according to Bouvier, is being in ambush for the purpose of murdering another. It implies a hiding or secreting of one's self.' *State v. Olds*, 24 Pac., 394, 403; 19 Or., 397.

"To constitute lying in wait, within the meaning of Acts 1829, ch. 23, par. 1, providing that all murder perpetrated by means of lying in wait shall be murder in the first degree, three things must concur, to wit, waiting, watching, and secrecy. *Riley v. State*, 28 Tenn. (9 Humph.), 646, 651." 5 Words & Phrases, 4262.

Assuming for the present that the defendant killed the deceased, the evidence is that he bought a railroad ticket at 5:30 o'clock, thus giving notice that he might be expected at the train; that he was standing "in the open," so that two persons on the train, Ramsey and Amos, saw him; that Sam Byrd, Jasper Reap, and Garfield and Aaron Pitts, Stafford and Kelly, were within twenty feet of him; Sumner, the conductor, and Patton, the railroad agent, within ninety feet; Laughter, the flagman, within thirty feet, and that Dr. Hennessee, Lum Branch, Miss Trexler, and Miss Smathers left the train during the shooting within fifteen feet of him.

It also appears that it was only "deep twilight," and Ramsey, the principal witness for the State, says: "I could tell perfectly well what was taking place on the outside."

If the only inference from this evidence is a killing by "lying in wait," I have no conception of the term, and if there is any other inference the defendant is entitled to a new trial.

Again, his Honor charged in reference to motive: "With regard to the question of motive for the commission of crime, the court further instructs you that if the evidence in this case fails to show the prisoner's motive for killing the deceased, this is a circumstance in his favor, which

the jury should consider along with the other evidence; but if the jury finds from all the evidence, direct and circumstantial, that the prisoner committed the crime charged, the jury are at liberty to find the prisoner guilty, whether any motive was apparent or not, because, while motive in the commission of a crime is a material element for a jury in considering it, yet if it is shown beyond a reasonable doubt that the crime was committed, it is not indispensable that the motive should be apparent to sustain a conviction."

This is objectionable in two aspects. In the first place it leaves the question of motive to the jury, when no one contends there is any evidence of motive, and the defendant was entitled to have the court so instruct the jury, and in the next place it is very close to an expression of opinion that the defendant killed the deceased.

What did the jury understand when his Honor said "if the evidence in this case fails to show the prisoner's motive for killing the deceased" except that he thought the prisoner killed him?

There are several statements made while stating the contentions of the parties, which, while they may not be ground for a new trial, because not called to the attention of the judge at the time, were very harmful.

He said the State contended that Amos was corroborated by the evidence of Joe Tallent; that Amos "told him that he recognized the man who was firing two pistols on the night of the tragedy," when Joe Tallent made no such statement, and Amos said, "I was in a conversation with a man named Tallent. I said that I was on the train that night; know I said that much. That's about all I thought I told him; that's all I recall now."

The importance of this will be recognized when it is remembered that Amos was the most material witness for the State, and that he was sadly in need of corroboration.

He also stated as a corroborating circumstance: "The testimony further of the prisoner's witness, Dr. T. V. Goode, whose examination of the wounds indicated that the greater part of them were fired at close range, and that most of them were probably fired by one person holding two pistols, or by two persons standing near to each other," when you will search in vain for such a statement by Dr. Goode. This was material, because it was the beginning of the effort to connect the defendant with some other person. He further said: "The State further contends that all the material evidence, including that of Ramsey, Amos, McSherry, and M. N. Hennessee, for the State, and that of Miss Ellen Trexler for the prisoner, tends to show that one person engaged in the assault of the deceased wore a dark brown or tan overcoat or raincoat, and that the only person at all about the station at Glen Alpine at that time of the tragedy who wore a coat of such description was the prisoner

now on trial, and the State contends that from this evidence the jury ought not to entertain a reasonable doubt as to the identity and guilt of the prisoner now on trial."

Mr. N. Hennessee was not at the station; did not see the man who shot, and did not testify that "one person engaged in the assaulting" of the deceased wore a dark brown or tan overcoat or raincoat, and Miss Trexler testified: "One was wearing a long black slicker or raincoat."

For these reasons I think there ought to be a new trial in the interest of human life.

BROWN, J., concurs in this opinion.