STATE v. PAUL FLYNN, ERNEST ASHLEY, DELMAR LEE (DUNK) VESTAL, AND MRS. MAUDE LAYMON.

(Filed 20 April, 1949.)

**1. Criminal Law § 52a (3): Larceny § 7—**

Evidence that all of the defendants were riding in the car with their victim when he discovered his money was gone, and direct and circumstantial evidence tending to show that defendants robbed him pursuant to a plan and conspiracy and thereafter divided the loot between them and sought by devices and maneuvers to baffle pursuit, two of them fleeing across several states, *is held* sufficient as to each defendant to be submitted to the jury upon the charges of larceny and receiving.

**2. Criminal Law §§ 34a, 48c—**

Incriminating statements voluntarily made by one of defendants to an officer are competent as against him, and the fact that such statements contained references to conversations, declarations, acts and incidents said and performed by his codefendants will not render the testimony incompetent upon objection of each of the other defendants when in each instance objection was made the court instructed the jury that the testimony was competent solely against the defendant who made the statements and was not to be considered against the other defendants.

**3. Criminal Law § 78e (2)—**

Ordinarily misstatements of the contentions or the evidence must be brought to the trial court's attention in time to afford opportunity for correction in order for an exception thereto to be reviewed.

**4. Larceny § 8—**

A charge correctly defining larceny will not be held for error for failing to refer to larceny from the person even though the State's evidence tends to show this offense, since larceny from the person is but an aggravation of the offense.

**5. Criminal Law § 53e—**

Where the State relies upon direct and circumstantial evidence for conviction, a charge that the burden is on the State to prove defendants' guilt beyond a reasonable doubt is sufficient in the absence of a request for special instructions as to the nature of circumstantial evidence.

DEFENDANTS' Paul Flynn, Ernest Ashley and Mrs. Maude Laymon appeal from *Clement, J.,* September Term, 1948, YADKIN Superior Court.

The defendants were tried on a bill of indictment charging them in two counts with (a) larceny of $500 from the person of one Dale Winters, and (b) receiving the money knowing it to have been feloniously stolen.

On the trial the State's evidence was substantially as follows:

Dale Winters testified that he saw Paul Flynn and Ernest Ashley at the "Nite Spot," in Jonesville early Sunday morning, about the 16th of May. They came in an automobile; and at Winters' request the three of them went in the automobile to get some liquor. It was at Litt Vestal's house, and there he met "Dunk" Vestal. He gave him two dollars out of his pocketbook, which contained besides this five one-hundred-dollar bills, and put the pocketbook back in his hip pocket, and Vestal went and got the liquor. The woman, Maude Laymon, was there. She and Ashley went down the path toward the spring. Dunk Vestal and Flynn came back with the whiskey, and Dunk began to shoot toward the spring and the woman came back, and Dunk gave her a "sort of whipping." Pretty soon Ernest came up. They all then went to various places and got and consumed quantities of liquor. All of them riding in the same car, they went up above Elkin, where there was plenty of liquor—Dunk and Ernest

and Maude Laymon on the front seat, Paul Flynn and Winters on the rear seat. Witness stated he had loaned Ernest Ashley a dollar on the night before.

Going back from Elkin to Jonesville, somewhere above Elkin, Ernest Ashley and Dunk Vestal transferred the Laymon woman from the front seat to the back, so placed that Winters was between the two, Paul Flynn on one side and Maude Laymon on the other. After they had gone some distance beyond the bridge and into Jonesville, Winters missed his pocketbook. He looked about for it, thinking possibly it had slipped out of his pocket. It was lying on the seat beside him. All the money was gone except two dollars. Said the witness: "I told them I wanted my money—said it to the whole crew." The witness picked up a wrench and told them to stop. As soon as he got out of the car they drove off, Dunk Vestal driving. Winters then went to the Jonesville police, and reported his loss. When the sheriff came, they went in search of the defendants but did not then find them.

Sheriff Moxley substantially corroborated Winters' testimony in so far as the transaction had been recently communicated to him. He further testified that he made a search for the defendants that night but was unable to find them. Ashley and Flynn were arrested next day. Dunk Vestal and Maude Laymon, after a few weeks, were apprehended in Cedartown, Georgia, sometime in July.

Sheriff Moxley was then permitted, over numerous objections by each of the defendants, to testify as to statements made by the defendant Vestal after his apprehension and during his incarceration, which the witness said were voluntarily made, and after warning that they would be used against him. On each objection the jury was instructed the declarations were admitted against Vestal alone and were not to be considered against the other defendants. (The objections were of a class,—made on the ground that they were *res inter alia acta,* or second-hand testimony of the conversation of the declarant. Distinction will be made where important.)

Vestal's statement as testified to by Sheriff Moxley was substantially as follows:

Maude Laymon came with Vestal from Winston-Salem to Elkin, and they went over together to the Nite Spot where they met Ashley. After drinking together, Ashley carried Vestal and the Laymon woman to Litt Vestal's place, left them, and promised to come back for them the next morning. Ashley came the next morning, which was Sunday, with some other parties. At that time Ashley told Vestal that "Dale Winters had some money on him and he was going to get it." Litt Vestal returning to his place meantime, asked them to leave, which they did, Ashley, Vestal, Laymon and the others in the same car, and went to Jonesville,

to the Nite Spot, where they came up with Winters.  Something was said about liquor.  Dale got in the car with them and they all went back to Litt Vestal's place, where Winters gave Vestal money to buy liquor with—$5.00.  They rode around a bit and Winters missed his money and accused them of getting it.  Vestal told him "they would go back out there," but Winters wanted to get out, and the car was stopped and Winters was let out, and they went on.

They went to Winston.  Ashley said they would be looking for his car, so they parked at a service station, got a taxi and went to Kernersville, to Maude Laymon's mother's.

When they got down there Ernest Ashley had $300—three one-hundred-dollar bills.  Ashley sent the taxi driver back to Kernersville to get change for $100.  When the taxi driver got back, Ashley gave him $100, gave Paul Flynn $50, and kept the rest.  The one-hundred-dollar bill Ashley gave the cab driver to carry to Kernersville and get changed.

Vestal and Maude Laymon spent the night near Kernersville, and next day Vestal called a cab and he and Maude Laymon went to Martinsville, Virginia, then by train to West Virginia, and, after a short stay there, went to Cedartown, Georgia, where he sawed himself out of jail.  In about 30 days he was arrested in Winston-Salem.

Ralph Stockton, a policeman of Kernersville, testified that on the night of May 15 a taxicab drove up with Bill Dean, the cab driver, Ernest Ashley and Paul Flynn in it, and he was asked if he could change a one-hundred-dollar bill.  Witness told them he did not have that much change on him, but would go home and get it.  When they got to the house, Ernest Ashley pulled a one-hundred-dollar bill out of his pocket-book, kept it hidden from witness, but took out the bill and slipped it to Dean, who gave it to the witness, who gave him three twenty-dollar bills and four ten-dollar bills in exchange.

Billy Dean testified that the night of the 16th of May the defendants, Dunk Vestal, Ernest Ashley, and Paul Flynn and Maude Laymon came to his taxicab stand in a Bluebird taxi, pulled up and told him to follow them out to Beesome's farm.  When witness got there, Dunk Vestal told him to "wait around."  Witness stayed about twenty minutes.  Dunk Vestal asked him to go up town and get a one-hundred-dollar bill changed so that he could "pay off the boys."  When the Bluebird cab got to Beesome's they paid the cabby off and he left.  Witness stayed about twenty minutes.  At Dunk Vestal's request he carried Paul Flynn back to Kernersville, and got his "boss," Mr. Morgan, to change a one-hundred-dollar bill.  Witness then took Flynn and Vestal back to Beesome's.  Maude Laymon, Ernest Ashley, Paul Flynn and Vestal were there,— went back in the house where they had liquor; and after awhile they

came out. After Vestal paid him off, he carried Ashley and Flynn back to Kernersville, where they saw Stockton.

Just before getting to Kernersville, Ashley said to the witness: "I want you to get a one-hundred-dollar bill changed so when we get to wherever we are going I will have money enough to pay you." Prior to this witness had got Mr. Morgan to change a one-hundred-dollar bill. Witness was now given a one-hundred-dollar bill by Ashley, and turned it over to Stockton, who went to the house and got change for it.

Witness carried the defendants Ashley and Flynn to Winston. From the point where they had left their car, witness directed them to the public highway, and left them. They paid him $10.25 for the trip.

On the following day, or day after, on a call, he picked up Vestal and Laymon and carried them to Martinsville, Virginia.

The State rested. The defendants offered no evidence. At the close of the evidence the defendants, each separately, demurred thereto, and moved for judgment as of nonsuit. This was overruled as to each defendant. Defendants excepted.

(Exceptions to the instructions to the jury will be noted in the opinion where necessary for discussion.)

The case was submitted to the jury, who returned a verdict of guilty, as to each defendant, on both counts. The defendants separately moved to set aside the verdict for errors committed on the trial, and the motions were declined. Defendants excepted. To the ensuing judgment on the verdict the defendants objected, excepted and appealed.

*Attorney-General McMullan and Assistant Attorney-General Moody for the State.*

*W. Scott Buck and Philip E. Lucas for defendant appellant Maude Laymon.*

*Allen Henderson for defendant appellants Paul Flynn and Ernest Ashley.*

SEAWELL, J. The evidence was legally sufficient to support conviction as to all the defendants, and the demurrers to the evidence were properly overruled. If any doubt existed as to the sufficiency of the evidence against Maude Laymon, it must be dispelled when we look at the whole series of transactions she was sharing with her codefendants as raising an inference of a conspiracy to commit the crime alleged, and to cover it up by devices and maneuvers that would baffle pursuit. During the ride near Jonesville, and just before Winters missed his pocketbook and found the money gone, this woman was transferred from the front seat to the back so that Winters was between her and Flynn. She was closely associated with the defendants at almost every critical part of the story;

with them when the evidence points to a division of the spoils, and finally, after crossing several states, was found with the defendant Vestal in Cedartown, Georgia. The defense suggests that she was an abandoned woman, following the fortunes of Vestal through other motives; this does not remove the inferences of her participation in the crime.

The more serious challenge to the trial refers us to the admission in evidence of Sheriff Moxley's testimony in which he related the voluntary statements made to him by Dunk Vestal, while in jail. We examine the question of its competency, keeping in mind the limitations and cautions imposed by the judge—that it should be taken only against Vestal and not against any of his codefendants. The connected and revealing story of Vestal contained at points references to conversations, declarations, acts and incidents said and performed by his codefendants pending the transactions which the State contends led to the parting of Winters and his money, which if directly in evidence would be legally unobjectionable, however damaging against the actors or declarants to whom they refer. At the same time they all unquestionably are competent evidence against Vestal, bearing not only on his guilty knowledge, but his actual participation in the crime charged. The trial judge, as we have indicated, upon every objection, meticulously instructed the jury that the evidence must be taken against Vestal alone and not against any of the other defendants.

The involvement and unraveling of closely knitted transactions in which a number of persons have played a part often presents perplexing questions of competency in this respect. A major operation in dissection of the evidence by rule cannot be undertaken by the court without destroying the subject or leading to confusion. Ordinarily the only device is that used by the judge in the instant case; cautioning the jury as to its application, under an instruction formulated as we find it here. Its use has not been seriously questioned. As a matter of necessity arising out of what appears to have been the close co-operation of the participants and conspiratorial character of the evidence leading to the crime, the necessity of its application occurred rather more frequently than defendants desired.

Numerous exceptions have been taken to the charge of the court, largely in preservation of objections to the admission of evidence as we have outlined it. Space forbids discussing the exceptions by number; but we do not find that those related to this subject disclose reversible error.

We do not find the exceptions to the charge based on inaccuracies in the statement of contentions or the statements of evidence of such a character that would take the case out of the rule that such matters might be called to the attention of the court at the time, so that the error

or mistake made may be then corrected. *In re Will of West,* 227 N.C. 204, 41 S.E. 2d 838.

The defendants object that the court failed to define the crime charged because it did not refer to larceny from the person. Since the fact that larceny was from the person is but an aggravation of the offense, and it is not necessary to charge it in order to prove it, and since the court correctly defined the crime of larceny as is usually done, the objection seems to be without merit. *S. v. Bynum,* 117 N.C. 749, 23 S.E. 218.

The evidence in this case was mixed, the direct evidence of observers of the facts related, and circumstantial evidence arising out of the whole complex of facts presented. While the court may, with propriety, and frequently does, pay special attention to the nature of circumstantial evidence, it has never suggested that circumstantial evidence is any different from so-called direct evidence with regard to the degree of conviction necessary to establish guilt. Nor is it required, except upon request, to elaborate on the peculiar nature of that evidence.

In the case at bar the judge instructed the jury in formula approved by this Court that they should be convinced beyond a reasonable doubt as to the guilt of any defendant before finding him guilty. *S. v. Brackett,* 218 N.C. 369, 11 S.E. 2d 146; *S. v. Schoolfield,* 184 N.C. 721, 114 S.E. 466; *S. v. Pierce,* 192 N.C. 766, 770, 136 S.E. 121; *S. v. Wiseman,* 178 N.C. 784, 794, 101 S.E. 629.

The appeal of Delmar Lee (Dunk) Vestal not having been perfected, is not before us and is not considered. ·

It has been impossible to treat all the exceptions of the defendants individually without writing a book,—they have been too numerous. In the classifications we have given them may be found the more serious contentions of the appellants. Many of the undiscussed exceptions present nothing novel or meirtorious and we have been constrained to reject them, although they have been considered. In those discussed, we find no reversible error.

No error.