STATE OF NORTH CAROLINA v. ERVIN RUSSELL ALLISON

No. 70

(Filed 4 September 1979)

1. **Searches and Seizures § 33— items in plain view in dwelling**

    The seizure of suspicious items in plain view inside a dwelling is lawful if the officer possesses legal authority to be on the premises.

2. **Searches and Seizures § 10— warrantless search—probable cause—exigent circumstances**

    A warrantless search is not unconstitutional when (1) probable cause to search exists and (2) the government satisfies its burden of demonstrating that the exigencies of the situation made search without a warrant imperative.

3. **Arrest and Bail § 5.2; Searches and Seizures § 10— warrantless entry into dwelling to make arrest**

    An officer's warrantless entry into defendant's trailer dwelling for the purpose of arresting defendant for murder was lawful where the first officer who arrived on the scene observed the victim's body lying on the ground near her son's trailer; the victim's son told the officer that defendant had shot his mother and, when asked where defendant was, pointed toward defendant's trailer located some 150 feet away; the first officer directed another officer to go to defendant's trailer to apprehend him; the second officer went to the trailer, knocked on the door and, when no one answered, went in; the officer took into custody a rifle which was in plain view on a couch in the trailer; the officer then looked through the trailer, found no one, and left. Consequently, the officer had legal authority to be in defendant's trailer, and his seizure of the rifle was lawful.

4. **Searches and Seizures § 41— failure of officer to announce purpose and authority before entry—seizure of rifle—reason to believe notice would present danger to life—no substantial violation of statute**

    Where an officer had been informed that the person who shot the deceased was in a nearby trailer, the officer went to the trailer and, after knocking, opened an unlocked door, instantly saw and seized a rifle on the sofa near the door, and then announced his purpose and authority to an empty trailer, the officer's failure to announce his purpose and authority before entering the trailer did not require the exclusion of the seized rifle under G.S. 15A-401(e)(1)c since (1) the officer might reasonably have believed that giving

notice of his authority and purpose to arrest defendant "would present a clear danger" to his life within the meaning of that statute, and (2) his conduct, if error, was not a substantial violation of the statute.

**5. Bills of Discovery § 6— defendant's statement not provided—motion to exclude or to grant continuance—prosecutor unaware of statement until trial—opportunity to interview officer**

The trial court did not abuse its discretion in the denial of defendant's motion to exclude an inculpatory statement made by him to the arresting officer or to grant a continuance because the State had failed to provide such statement pursuant to defendant's request for discovery where the district attorney first learned of defendant's statement during the lunch hour of the day the statement was offered in evidence, and as soon as the statement came to his attention he notified defense counsel and arranged for him to interview the arresting officer prior to the reconvening of the afternoon court session.

**6. Homicide § 4.1— first degree murder—lying in wait**

When G.S. 14-17 speaks of murder perpetrated by lying in wait, it refers to a killing where the assassin has stationed himself or is lying in ambush for a private attack upon his victim. However, it is not necessary that the assassin be actually concealed in order to lie in wait.

**7. Homicide §§ 4.1; 25.2— instructions on lying in wait**

The State's evidence in this first degree murder case supported the court's instructions on lying in wait where it tended to show that defendant was parked facing the highway by which the victim would return to her son's trailer; as the victim passed by defendant, he pulled in behind her car, and when she pulled into the .trailer lot, defendant, who had been right on her bumper, sped past her toward his own nearby trailer; while the victim carried packages into her son's trailer, defendant stationed himself beside or behind a tree 150 feet away on higher ground; and when the victim went back outside to get her pocketbook from the fender of the car, defendant called to her and immediately fired a single lethal shot.

**8. Homicide § 30.1— murder by lying in wait—failure to submit second degree murder**

The trial court did not err in restricting the jury to the two possible verdicts of guilty of murder in the first degree or not guilty where all the evidence shows that the murder was committed by lying in wait, and the controverted question was the identity of defendant as the murderer.

Justice BROCK did not participate in the consideration or decision of this case.

APPEAL by defendant pursuant to G.S. 7A-27(a) from *Martin (Harry), J.,* 20 June 1977 Session of the Superior Court of McDOWELL County, docketed and argued as Case No. 15 at the Spring Term 1978.

State v. Allison

Defendant was tried upon an indictment, drawn under G.S. 15-144, which charged that on 3 March 1977 he murdered his wife, Rose Evelyn Allison. He appeals a judgment of life imprisonment imposed upon the jury's verdict of guilty of first degree murder.

The State's evidence tended to show:

At approximately 1:30 p.m. on 3 March 1977 defendant's wife and her son, Joseph Whittaker, defendant's stepson, were driving to Joseph Whittaker's house trailer in McDowell County. About a half mile from their destination they saw defendant parked alongside the road facing the highway in his white Buick. As they passed, defendant "cranked up" and pulled in behind their car. When Joseph turned in at his trailer, defendant — who had been right on his bumper — sped past them toward his own mobile home located approximately 254 feet away on a slight hill. After Joseph parked, he and his mother took some articles from the car and started toward the Whittaker trailer. At that time Joseph saw defendant come around the corner of his trailer. He was "kind of hunkering down and peeking down there at us" from his trailer. Joseph, who had previously received a leg injury, thought defendant was looking at him because of his crutches. Joseph went into the trailer, and Mrs. Allison went back outside to retrieve her purse which she had left on the fender of the car.

While Joseph was still inside the trailer, he heard someone holler "Hey." Immediately thereafter he heard a rifle shot. As quickly as he could, he went to the door and from there he saw his mother lying out in the yard. Looking up the hill toward defendant's trailer, he observed defendant "either knelt or hunkered down" with a rifle against a pine tree. He held the rifle still aimed at Mrs. Allison. Seeing no one else anywhere around, Joseph went into the rear bedroom, got a pistol, and went outside. From up on the hill he heard a car door slam, an engine crank, and a car drive away. When defendant did not come back down the hill after a few seconds, Joseph went to his mother. Upon opening her blouse and seeing a bullet hole in her chest, he knew she was dead.

Joseph drove to a neighbor's house, told him defendant had shot his mother, and asked him to call the police. He then went to the front of defendant's trailer, saw no car, and returned home.

Deputy Sheriff Eddie Smith arrived first at Whittaker's trailer. He testified that when he asked Joe Whittaker what had happened, all Joe told him was that defendant had shot his mother. When Deputy Smith asked him "where?", Joseph pointed toward the trailer near the tree about 150-200 feet away. At this time Deputy Mack Autrey drove up. Smith, who had not been told that Joseph had heard a car door slam or that he had been to defendant's trailer, instructed Autrey "to check the trailer to see if Ervin Allison was in there." Smith then went to the pine tree near defendant's trailer and measured the distance from that tree to Mrs. Allison's body. It was 254 feet. He found bark from the tree lying around its base and footprints facing the Whittaker trailer.

Deputy Autrey testified that when he arrived at the scene about 3:00 p.m. in response to a call, there was a body lying in the yard. Deputy Smith met him in the Whittaker driveway, told him he had been informed "that there was a subject in the trailer that just shot this woman and he asked [him] to go to the trailer." In consequence, Autrey went to the trailer on the hill. After knocking on the door and getting no response, he tested the door. It was unlocked, and he went in. On a couch to the right of the door the deputy immediately saw a .22 caliber rifle, State's Exhibit No. 1. Autrey seized the rifle, announced his presence and authority, and proceeded to search the trailer for the defendant. No one was there. Autrey had neither an arrest nor a search warrant when he entered the trailer.

The testimony of State Highway Patrolman T. C. Maye tended to show that on 3 March 1977, shortly after 3:00 p.m., he observed a white Buick traveling very slowly north on U.S. 19-23, north of Asheville. It matched the description of defendant's car he had received over the police radio. After following it approximately a mile, Maye stopped defendant's vehicle. In the car Maye observed "some containers of alcohol"; on defendant's person he found "a container of valium." Defendant had a strong odor of alcohol about him and was obviously "under the influence." Officer Maye charged defendant "with driving under the influence." He then took him into custody, advised him of his rights, and took him to the Buncombe County jail breathalyzer room.

State v. Allison

During the trip defendant made the voluntary and spontaneous statement to the officer "that he had just gotten rid of seventeen years of trouble and that he was going to get his sister to take care of his 10-year-old child and he was going to hide out in Madison County."

Mr. Frank Satterfield, an expert in ballistics and firearm identification, examined the lead fragment removed from Mrs. Allison's body. However, because of the distortion and mutilation of the bullet, he could not say positively it had been fired from State's Exhibit No. 1. However, he did say, "but I would explain further that the bullet could well have been fired in there."

Defendant did not testify. The record shows, however, that he "offered 4 alibi witnesses whose testimony tended to show that the defendant was in the barber shop of his brother-in-law Emory Moxley on Lexington Avenue in Asheville, North Carolina, in an intoxicated condition from approximately 1:50 p.m. until 2:25 p.m. on March 3, 1977."

The record also discloses that the State offered rebuttal evidence from three witnesses which tended to show "that the defendant or his car was seen in the area of the shooting at approximately 1:15 p.m. until 2:10 p.m., 3 March 1977."

*Attorney General Rufus L. Edmisten, Associate Attorney Rebecca R. Bevacqua, for the State.*

*E. Penn Dameron, Jr., for defendant.*

SHARP, Chief Justice.[1]

Defendant's first assignment of error is that the trial judge erred in admitting over defendant's objection the .22 caliber rifle (State's Exhibit No. 1) which Deputy Sheriff Autrey took from defendant's trailer on the afternoon of 3 March 1977. When the State offered the rifle in evidence, defendant objected and moved to suppress the rifle as the fruit of an illegal search. The judge immediately conducted a voir dire, overruled defendant's contention that the seizure of the rifle violated his rights under U.S. Const., Fourth Amendment, N.C. Const., Art. 1, § 20, and G.S.

---

1. This opinion was written in accordance with the Court's decision made prior to Chief Justice Sharp's retirement and was adopted by the Court and ordered filed after she retired.

15A-401(e)(1), and admitted the rifle in evidence. We consider first the constitutional questions involved.

[1] The seizure of suspicious items in plain view inside a dwelling is lawful if the officer possesses legal authority to be on the premises. *State v. Hoffman,* 281 N.C. 727, 736, 190 S.E. 2d 842, 849 (1972). *Accord, Harris v. United States,* 390 U.S. 234, 19 L.Ed. 2d 1067, 88 S.Ct. 992 (1968); *State v. Howard,* 274 N.C. 186, 162 S.E. 2d 495 (1968).

As pointed out in the dissenting opinion of Mr. Justice Marshall and Mr. Justice Brennan in *United States v. Santana,* 427 U.S. 38, 45, 49 L.Ed. 2d 300, 307, 96 S.Ct. 2406, 2411 (1976), the Supreme Court continues to reserve the "question of whether and under what circumstances a police officer may enter the home of a suspect in order to make a warrantless arrest." *See also People v. Peyton,* 45 N.Y. 2d 300, 408 N.Y.S. 2d 395, 380 N.E. 2d 224 (1978), *Coolidge v. New Hampshire,* 403 U.S. 443, 476-482, 29 L.Ed. 2d 564, 588-92, 91 S.Ct. 2022, 2043-44 (1971). However, the following dicta and other similar expressions in *Coolidge v. New Hampshire,* supra, suggest that the Supreme Court will eventually hold that the Fourth Amendment imposes upon a warrantless entry for the purpose of making an arrest limitations comparable to the strictures on residential searches and seizures:

"It is clear, then, that the notion that a warrantless entry of a man's house in order to arrest him on probable cause is per se legitimate is in fundamental conflict with the basic Fourth Amendment law that seizures inside a man's house without warrant are per se unreasonable in the absence of some of a number of well defined 'exigent circumstances.'" *Id.* at 477-78, 29 L.Ed. 2d 589-90, 91 S.Ct. 2044.

The Fourth Amendment to the United States Constitution and Art. 1, § 20 of the North Carolina Constitution prohibit officers of the law, under ordinary circumstances, from invading the home except under authority of a search warrant issued in accord with constitutional and statutory provisions. *McDonald v. United States,* 335 U.S. 451, 93 L.Ed. 153, 69 S.Ct. 191 (1948); *State v. Robbins,* 275 N.C. 537, 169 S.E. 2d 858 (1969). Further, evidence obtained during an unconstitutional search is inadmissible at trial, not as a rule of evidence, but as a requisite of due process. *Mapp v. Ohio,* 367 U.S. 643, 6 L.Ed. 2d 1081, 81 S.Ct. 1684 (1961); *State*

*v. Colson,* 274 N.C. 295, 163 S.E. 2d 376, *cert. denied,* 393 U.S. 1087 (1968).

[2]　A warrantless search is not unconstitutional, however, when (1) probable cause to search exists and ·(2) the government satisfies its burden of demonstrating that the exigencies of the situation made search without a warrant imperative. *Chimel v. California,* 395 U.S. 752, 23 L.Ed. 2d 685, 89 S.Ct. 2034 (1969). If the circumstances of a particular case render impracticable a delay to obtain a warrant, a warrantless search on probable cause is permissible, because the constitutional proscriptions run only against *unreasonable* searches and seizures. *See Maryland Penitentiary v. Hayden,* 387 U.S. 294, 18 L.Ed. 2d 782, 87 S.Ct. 1642 (1967); *State v. Ratliff,* 281 N.C. 397, 189 S.E. 2d 179 (1972).

[3]　In connection with warrantless entries into a dwelling to make an arrest, the federal courts have isolated seven factors, first cataloged in *Dorman v. United States,* 435 F. 2d 385, 392-393 (D.C. Cir. 1970), which are weighed together to assess the reasonableness of a failure to acquire a warrant: (1) the gravity and violent character of the offense; (2) the reasonableness of the belief the suspect is armed; (3) the degree of probable cause to believe the suspect committed the crime involved; (4) whether reason to believe the suspect is in the premises entered existed; (5) the likelihood of escape if not swiftly apprehended; (6) the amount of force used to effect the unconsented entry; and (7) whether the entry was at day or night.

Most of the other federal circuits have explicitly or implicitly approved the *Dorman* rationale. *See, e.g., United States v. Jarvis,* 560 F. 2d 494 (2d Cir.), *cert. denied,* 435 U.S. 934 (1977); *United States v. Reed,* 572 F. 2d 412 (2d Cir. 1978), *cert. denied,* 439 U.S. 913 (1978); *United States v. Cravero,* 545 F. 2d 406 (5th Cir. 1976), *cert. denied,* 430 U.S. 983 (1977); *United States v. Shye,* 492 F. 2d 886 (6th Cir. 1974) *(per curiam); Salvador v. United States,* 505 F. 2d 1348 (8th Cir. 1974); *United States v. Phillips,* 497 F. 2d 1131 (9th Cir. 1974); *United States v. Davis,* 461 F. 2d 1026 (3d Cir. 1972); *Vance v. State of North Carolina,* 432 F. 2d 984 (4th Cir. 1970). In light of these decisions, we deem it appropriate to judge the constitutionality of Deputy Autrey's entry in accordance with doctrines developed in the context of searches and seizures.

After the voir dire the trial judge found the facts to be in accordance with the testimony of Joseph Whittaker and Deputies Smith and Autrey as set out in the preliminary statement. Defendant took no exceptions to these findings, which are summarized below:

After Joseph Whittaker summoned the officers, Deputy Smith was the first to arrive. He observed the body of Mrs. Rose Allison lying on the ground and, in his opinion, she was dead. Whittaker told Smith that defendant Allison had shot his mother and, when asked where Allison was, he pointed toward his trailer which was located some 150 feet away. About this time Officer Autrey arrived on the scene. Whittaker had not told Smith that he had heard a car door slam, the engine crank, and a car leave. Nor did he tell Smith he had been to the trailer looking for the defendant. "Smith told Whittaker to get under cover as he might be endangered and directed Deputy Sheriff Autrey to go to the defendant's trailer for the purpose of apprehending the defendant." Following instructions, Autrey went to the trailer, knocked on the door and, when no one answered, went in. On a couch "immediately in the trailer," he saw a rifle which he took into custody. He looked through the trailer, found no one, and left.

The information which Joseph Whittaker furnished Deputy Smith when he found Mrs. Rose Allison lying on the ground shot to death in front of her son's trailer clearly gave him probable cause to believe that defendant had committed murder — a most grave and violent crime. Smith had every reason to believe that defendant was armed, and it was certainly not unreasonable to believe that defendant would likely escape if not apprehended immediately. Whittaker, in answer to a direct question, had told Smith that defendant was at his trailer by pointing to it. When Autrey arrived, Smith communicated this information to him; and he reasonably relied upon it. "Probable cause 'may be based upon information given to the officer by another, the source of such information being reasonably reliable.'" *State v. Phifer*, 290 N.C. 203, 215, 225 S.E. 2d 786, 794 (1976), *cert. denied*, 429 U.S. 1050 (1977). When Autrey entered the empty trailer in the daytime after knocking, he merely turned the knob of an unlocked door.

The foregoing facts embrace all the exigent circumstances cataloged in *Dorman v. United States*, supra, and fully justified

Autrey's warrantless entry. Additionally, we would point out that even if Autrey's entry had been unlawful no real benefit resulted to the State from the seizure of defendant's rifle, for the State was unable to establish that the bullet fragments recovered from Mrs. Allison's body were fired from it. As Judge Craven noted in *Vance v. State of North Carolina*, 432 F. 2d 984, 990 (4th Cir. 1970) (a case involving a warrantless arrest), in criminal practice unconstitutional police behavior is immaterial "so long as they are not permitted to benefit from their lawless conduct in court."

[4] We next consider defendant's contention that Deputy Autrey's entrance into the trailer was a violation of N.C. Gen. Stat. 15A-401(e)(1)b. and c. in that (1) he lacked reasonable cause to believe defendant was in the trailer and (2) he did not announce his authority and purpose to enter immediately after knocking on the door but waited until after he had opened the unlocked door and stepped into the front room. This section provides:

"(1) A law-enforcement officer may enter private premises or a vehicle to effect an arrest when:

a. The officer has in his possession a warrant or order for the arrest of a person or is authorized to arrest a person without a warrant or order having been issued,

b. The officer has reasonable cause to believe the person to be arrested is present, and

c. The officer has given, or made reasonable effort to give notice of his authority and purpose to an occupant thereof, unless there is reasonable cause to believe that the giving of such notice would present a clear danger to human life."

For the purpose of this argument defendant concedes "that the requirements of subsection 'a' were met in the instant case, in that Deputy Autrey had probable cause to believe that the defendant had committed the felony of murder." We find no merit in defendant's contention that Autrey violated subsection "b" for, as we have heretofore pointed out, Autrey did have reasonable cause to believe defendant was in the trailer. As to subsection "c", we note that here we are not dealing with a situation where an officer entered occupied premises without "knocking or an-

nouncing" and violence erupted in consequence.[2] In this case, after knocking, Deputy Autrey opened an unlocked door, instantly saw and seized a rifle on the sofa immediately to the right of the door, and then announced his presence and authority to an empty trailer. Upon ascertaining that the premises were unoccupied, Autrey left and turned the rifle over to Deputy Smith.

At the time Autrey approached defendant's trailer all he knew was that 150 feet away a woman was lying dead from a bullet wound which — he was told by the first officer on the scene — had been inflicted by a man who was supposed to be in the trailer. Under these conditions Autrey might reasonably have feared that giving notice of his authority and purpose to arrest defendant "would present a clear danger" to his life. Under all the circumstances, we conclude that the manner of Officer Autrey's entry was reasonable and his failure to announce after knocking and before entry, if error, was not a substantial violation of G.S. 15A-401(e)(1)c. and therefore did not require the exclusion or suppression of the rifle.[3]

For the reasons stated we uphold the trial judge's ruling that Deputy Autrey's entry into the trailer and his seizure of the rifle were lawful, and we overrule defendant's first assignment of error.

[5] Prior to the trial, in response to defendant's request under G.S. 15A-902, -903, the State informed defendant's counsel that defendant had made no inculpatory statements while in custody and that no statements by defendant would be offered in evidence. Later, during the trial, the State offered the testimony of the arresting officer, Patrolman T. C. Maye, that during the

---

2. Compare *State v. Sparrow*, 276 N.C. 499, 512, 173 S.E. 2d 897, 905-06 (1970).

3. § 15A-974. Exclusion or suppression of unlawfully obtained evidence. — Upon timely motion, evidence must be suppressed if:

(1) Its exclusion is required by the Constitution of the United States or the Constitution of the State of North Carolina; or

(2) It is obtained as a result of a substantial violation of the provisions of this Chapter. In determining whether a violation is substantial, the court must consider all the circumstances, including:

a. The importance of the particular interest violated;

b. The extent of the deviation from lawful conduct;

c. The extent to which the violation was willful;

d. The extent to which exclusion will tend to deter future violations of this Chapter. (1973, c. 1286, s. 1.)

drive to the Buncombe County jail on 3 March 1977 defendant told him "that he had just gotten rid of seventeen years of trouble and that he was going to get his sister to take care of his ten-year-old child and he was going to hide out in Madison County." Defendant objected to this testimony on the ground that the State had failed to comply with the discovery sections of Chapter 15A and moved the court alternatively to prohibit the introduction of the testimony or to grant a continuance. The court, after conducting a voir dire, denied defendant's alternative motion. This ruling is the subject of defendant's assignment of error No. 2.

The evidence adduced upon voir dire tended to show that at the time the State responded to defendant's motion for discovery neither the district attorney nor any of his assistants were aware of the statement which defendant had made to Patrolman Maye, who was then stationed in another district; that the district attorney first learned of defendant's statement during the lunch hour of the day the statement was offered in evidence; that as soon as the statement came to his attention he notified defense counsel of it and arranged for him to interview Patrolman Maye prior to the reconvening of the afternoon court session.

Defense counsel stipulated that the district attorney had notified him of Mr. Maye's proposed testimony "as soon as he was notified by Mr. Maye." Counsel did not question the State's good faith; his contention was that the district attorney should have ascertained what Maye's testimony would have been prior to the trial. At the conclusion of the voir dire, the court found the facts to be as all the testimony tended to show, and held that the district attorney had complied with the provisions of Chapter 15A with reference to discovery when he advised counsel of defendant's statement as soon as he learned of it and gave him an opportunity to talk with Patrolman Maye prior to the resumption of the trial.

G.S. 15A-910 gives the trial judge ample authority to provide relief when either the State or defendant fails to comply with the discovery article of Chapter 15A. However, "the exclusion of evidence for the reason that the party offering it has failed to comply with the discovery statutes granting the right of discovery, or with an order issued pursuant thereto, rests in the

discretion of the trial court. . . . The exercise of that discretion, absent abuse, is not reviewable on appeal." *State v. Hill*, 294 N.C. 320, 331, 240 S.E. 2d 794, 801-02 (1978). In the court's denial of defendant's alternative motion, we perceive no abuse of discretion; and defendant has pointed to no prejudice resulting to him from the delayed disclosure that Patrolman Maye would testify to the statement in question. Assignment of error No. 2 is overruled.

The remaining assignments of error relate to the judge's charge. Defendant's third assignment challenges the following instruction:

"I charge you that if the State has satisfied you from the evidence and beyond a reasonable doubt that on March 3rd, 1977, the defendant, Ervin Allison, by lying in wait, that is by concealing himself behind a tree and watching and waiting for Rose Allison to come out of her house, unlawfully and intentionally killed Rose Allison by shooting her with a .22-calibre rifle, it would be your duty to return a verdict of guilty of murder in the first degree."

Defendant contends this instruction was erroneous because Whittaker, who identified defendant as the assassin, testified that defendant was plainly visible to him. He argues that therefore there was no evidence defendant ever concealed himself behind a tree. He further argues that the court's instructions must have led the jury to believe "that the act of partially concealing one's self by placing a rifle against the trunk of a small tree would constitute lying in wait as a matter of law." For the reasons hereinafter stated we find no error in the court's instructions.

In pertinent part G.S. 14-17 provides: "A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate and premeditated killing . . . shall be deemed to be murder in the first degree. . . ."

In this jurisdiction "[t]he precedents show that while being in ambush would be lying in wait, it is not necessary that a person [the assassin] should be concealed." *State v. Walker*, 170 N.C. 716, 718, 86 S.E. 1055, 1056 (1915). In affirming defendant's conviction of first degree murder in *State v. Wiggins*, 171 N.C. 813, 89 S.E. 58 (1916), this Court said, "There was evidence, which the jury

believed, that the prisoners lay in wait and killed the deceased from ambush. There was no evidence tending to show any other state of facts, and the sole issue of fact was as to the identity of the prisoners, that is whether they were the persons who slew the deceased." In a dying declaration, the deceased had said that about 7:30 a.m., as he rode his mule down the road toward Robbinsville, he had seen and passed the two defendants at a big chestnut at Hazel Branch. After he passed them, one of the defendants shot him in the back. That night he died from the bullet wound. There was also evidence that bloodhounds had marked defendants, that defendants bore deceased a grudge, and that both had threatened to kill him.

In *State v. Wiseman*, 178 N.C. 784, 101 S.E. 629 (1919), the deceased was killed at twilight within moments after he stepped off the train at Glen Alpine. As soon as he had walked around the two or three people who were waiting to board the train, ten bullets from a pistol were fired into his body. Powder burns indicated that the pistol must have been fired within twenty inches of the victim. Two men at the station identified the defendant as the man they saw standing with a pistol in each hand, emptying each pistol into the body of the deceased as rapidly as he could pull the trigger. In affirming the defendant's conviction (Chief Justice Clark writing the opinion), the Court said, "That the slaying was by lying in wait, is beyond question."

In *State v. Dunheen*, 224 N.C. 738, 32 S.E. 2d 322 (1944), the State's evidence was that on the night of May 8th the defendant concealed a gun behind a hedge on the edge of a street. About 8:00 a.m. on May 9th he was seen stooping behind the hedge. Thereafter, from time to time, up until 9:15 a.m., witnesses saw the defendant behind the hedge. At 9:15 a.m. the deceased passed along the street by the hedge, and defendant shot her to death. The State prosecuted the defendant on the theory that he was either guilty of perpetrating a murder by lying in wait or not guilty. The jury convicted him of first degree murder, and this Court affirmed.

[6] The foregoing decisions make it clear that when G.S. 14-17 speaks of murder perpetrated by lying in wait, it refers to a killing where the assassin has stationed himself or is lying in ambush for a private attack upon his victim. An assailant who watches

and waits in ambush for his victim is most certainly lying in wait. However, it is not necessary that he be actually concealed in order to lie in wait. If one places himself in a position to make a private attack upon his victim and assails him at a time when the victim does not know of the assassin's presence or, if he does know, is not aware of his purpose to kill him, the killing would constitute a murder perpetrated by lying in wait. See State v. Wiseman, supra at 789-90, 101 S.E. at 630-31. Certainly one who has lain in wait would not lose his status because he was not concealed at the time he shot his victim. The fact that he reveals himself or the victim discovers his presence will not prevent the murder from being perpetrated by lying in wait. Indeed, a person may lie in wait in a crowd as well as behind a log or a hedge. See State v. Miller, 110 Ariz. 489, 520 P. 2d 1113 (1974).

[7]  All the evidence in this case supports the trial court's charge on lying in wait. The State's evidence tended to show that about 1:30 p.m. on the day of Mrs. Allison's death, defendant was parked facing the highway by which his wife would return to her son's trailer; that as she passed by him he pulled in behind her car, and when she drove into the trailer lot he was "right on the bumper." However, he "poured the gas on and went shooting out the road in the direction of his trailer." Thereafter, while Mrs. Allison carried packages into the trailer after leaving her pocketbook on the fender of the car, defendant stationed himself beside or behind a tree 150 feet away on higher ground. When Mrs. Allison went back outside to get her pocketbook, defendant called to her and immediately fired a single lethal shot. Defendant's evidence did not call into question the manner of Mrs. Allison's death; it related only to defendant's alibi and disputed only the identity of her killer. The trial judge correctly applied the law with reference to murder perpetrated by lying in wait to the evidence in this case, and defendant's assignment of error No. 3 is overruled.

[8]  Defendant's fourth and final assignment of error is that the trial judge erred in restricting the jury to the two verdicts of guilty of murder in the first degree or not guilty. He contends that the issue of his guilt of murder in the second degree should also have been submitted. This contention is without merit, for in this case the uncontradicted evidence excludes the possibility of a verdict of a lesser degree of guilt than first degree murder. It has

long been the rule in this State that "[w]hen the entire evidence shows, and no other reasonable inference can be fairly drawn therefrom, that the murder was committed either by lying in wait or in an attempt to perpetrate a felony, and the controverted question is the identity of prisoner as the murderer, the trial judge does not commit error in charging the jury to render a verdict of guilty of murder in the first degree or not guilty." *State v. Wiggins*, 171 N.C. 813, 817, 89 S.E. 58, 60 (1916) and *State v. Spivey*, 151 N.C. 676, 65 S.E. 995 (1909). *Accord, State v. Dunheen*, 224 N.C. 738, 32 S.E. 2d 322 (1944); *State v. Satterfield*, 207 N.C. 118, 176 S.E. 466 (1934); *State v. Walker*, 170 N.C. 716, 86 S.E. 1055 (1915). *See State v. Wiseman*, 178 N.C. 784, 795-796, 101 S.E. 629, 633-34 (1919). As Justice Barnhill (later Chief Justice) pointed out in *State v. Dunheen*, "When a homicide is perpetrated by means of poison, lying in wait, imprisonment, starving, or torture, the means and method used involve planning and purpose. Hence the law presumes premeditation and deliberation. The Act speaks for itself. G.S. 14-17." *State v. Dunheen*, supra at 739-40, 32 S.E. 2d at 323-24.

In the trial below we find

No error.

Justice BROCK did not participate in the consideration or decision of this case.