STATE OF NORTH CAROLINA v. TERENCE COREY AIKENS

No. 150A95

(Filed 9 February 1996)

## 1. Homicide § 260 (NCI4th)— first-degree murder—lying in wait—sufficiency of evidence

The evidence was sufficient to support defendant's conviction of first-degree murder on the theory of lying in wait where it tended to show that defendant went to the victim's home while he was sleeping, armed himself with a loaded gun, and hid in his girlfriend's bedroom; defendant remained out of sight while his girlfriend awakened the victim and told him there was something wrong with the washing machine; defendant watched for the victim to come out of his bedroom and followed him as he walked to the laundry room; defendant shot the victim one time in the laundry room and then ran into another room; defendant watched through a crack in the door while the victim walked into the kitchen; defendant remained hidden until he walked into the kitchen and said, "You know it's over now, motherf——," and the victim said something to defendant; defendant saw the victim reach for something behind him and ordered the victim to get on the floor; defendant then shot the victim two more times; prior to the fatal shots, the victim did not have time to arm himself or to complete a 911 emergency call; and defendant testified that prior to entering the kitchen to confront the victim, he "waited around there for like a minute" and wondered whether he should go into the kitchen or leave. The victim's awareness that he had been assaulted after the first shot and the interval of time between the first shot and the fatal shots, during which time defendant confronted the victim and they had a verbal exchange, did not negate the element of surprise and render the evidence insufficient to support conviction on the theory of lying in wait.

**Am Jur 2d, Homicide §§ 47, 49.**

**Homicide: what constitutes "lying in wait". 89 ALR2d 1140.**

## 2. Homicide § 663 (NCI4th)— murder by lying in wait—specific intent not required—voluntary intoxication irrelevant

Voluntary intoxication is irrelevant to a charge of first-degree murder by lying in wait, a crime that does not require a finding of

STATE v. AIKENS

[342 N.C. 567 (1996)]

specific intent, because voluntary intoxication may only be considered as a defense to specific intent crimes. Therefore, the trial court did not err by failing to instruct the jury on voluntary intoxication in a prosecution for murder by lying in wait.

**Am Jur 2d, Homicide §§ 47, 49, 127-129.**

**Homicide: what constitutes "lying in wait". 89 ALR2d 1140.**

**Effect of voluntary drug intoxication upon criminal responsibility. 73 ALR3d 98.**

3. **Evidence and Witnesses § 1246 (NCI4th)— confession by juvenile—warnings of rights—trial as adult—rewarning of juvenile rights—issues first raised on appeal—constitutional rights not violated**

Where a juvenile tried as an adult for first-degree murder failed to attack the admissibility of his confession at trial on the grounds that he was not informed prior to waiving his rights that he could be tried as an adult and that he was not rewarned of his juvenile rights, he may not do so for the first time on appeal. Furthermore, the trial court's findings are supported by competent evidence, and those findings support the trial court's conclusions that defendant voluntarily, knowingly, and understandingly waived his rights before giving the statement and that none of his constitutional rights were violated.

**Am Jur 2d, Appellate Review § 614; Criminal Law §§ 788, 792; Evidence §§ 719, 723.**

4. **Criminal Law § 878 (NCI4th)— deadlocked jury—supplemental instructions—substantial compliance with statute—no coercion of verdict**

The trial court's supplemental instructions to a deadlocked jury in a first-degree murder trial sufficiently addressed all of the concerns set out in N.C.G.S. § 15A-1235(b)(2) and (b)(4) and thus did not coerce a verdict in violation of defendant's constitutional rights, although they did not track the specific language of those subsections, where the trial court advised the jury to "keep an open mind and consider the opinions of all the other jurors and, if you can, to reach a unanimous decision if you can do that without the surrender of any conscientious or individual convictions"; the trial court further instructed that "no juror should give up his

STATE v. AIKENS

[342 N.C. 567 (1996)]

own personal convictions solely for the purpose of reaching a verdict" and that the jury should try to reach a verdict "without surrendering any individual conscientious convictions"; and the court twice assured the jurors that it was not trying to force them to reach a verdict.

**Am Jur 2d, Trial §§ 1104, 1108, 1448, 1451.**

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of life imprisonment entered by Freeman, J., at the 5 December 1994 Criminal Session of Superior Court, Forsyth County, upon a jury verdict of guilty of first-degree murder. Heard in the Supreme Court 13 December 1995.

*Michael F. Easley, Attorney General, by Gail E. Weis, Associate Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Janine M. Crawley, Assistant Appellate Defender, for defendant-appellant.*

PARKER, Justice.

A juvenile petition alleging that defendant committed one count of first-degree murder was filed in the Juvenile Court in Forsyth County on 1 October 1993. By order of the Juvenile Court, defendant was bound over to Superior Court for trial as an adult pursuant to N.C.G.S. § 7A-608. On 14 February 1994 defendant was indicted for the first-degree murder of Robert Lee McCravy. Defendant was tried noncapitally. The jury found defendant guilty of first-degree murder on the basis of lying in wait, and Judge Freeman sentenced defendant to life imprisonment.

The State's evidence tended to show that Robert and Sharon McCravy were married in 1991 and lived in Winston-Salem, North Carolina. In 1993 Sharon's teenage daughter, Sherika Caines, came to live with them. Defendant thereafter became Sherika's boyfriend.

On 14 September 1993 Mark Winfrey of the Pardue Insurance Agency met with Robert and Sharon McCravy at their home to discuss life insurance. While there Winfrey saw a young female talking on the telephone and later saw her "kind of standing around the corner kind of in an eavesdropping type of situation on the other side of the kitchen." On 14 September 1993 Winfrey wrote a $100,000 life insurance policy on both Robert and Sharon McCravy.

STATE v. AIKENS

[342 N.C. 567 (1996)]

On 28 September 1993 Damian Shaw, Frederick Carlson, and Albert Walker gave Sherika a ride home. During the drive Sherika stated they were going to be "running into some money, a lot of money real soon." Later Shaw, Carlson, and Walker went to defendant's house to eat pizza. Defendant told the group that he was going to kill Sherika's parents. Defendant showed the group the gun he was planning to use for the murders. Sometime on 29 September 1993, defendant gave the gun to Sherika. In the early morning of 30 September 1993, defendant again told Shaw that he was serious about killing Sherika's parents.

Between 6:00 and 6:30 a.m. on 30 September 1993, defendant called Sherika and talked with her for ten to fifteen minutes. Defendant then told Shaw that they were going to pick up Sherika. Defendant and Shaw told Carlson where they were going, and he joined them. At approximately 7:00 a.m. defendant, Shaw, and Carlson arrived at Sherika's house in Shaw's blue 1987 Celebrity. Defendant told Shaw and Carlson to stay in the car while he went into the house to get Sherika. Shaw saw Sherika open the front door when defendant knocked.

Defendant entered the house, got the gun from Sherika, and went to Sherika's bedroom. Defendant waited in the bedroom while Sherika awakened Robert McCravy (victim) and told him there was something wrong with the washing machine. When the victim went into the laundry room, defendant went in behind him and fired one shot without looking. Defendant then ran into another room and observed the victim through a crack in the door. Defendant observed the victim coming down the hall toward the kitchen, holding his head and yelling for someone to call the police. Defendant came out of the room and confronted the victim in the kitchen. Defendant said, "You know it's over now, motherf——." Defendant saw the victim reach for something behind him. Defendant told the victim to get on the floor, and then he shot the victim two more times.

Bobby L. Johnson, a school bus driver with the Winston-Salem/Forsyth County Schools, pulled up to the McCravy house shortly after 7:00 a.m. on 30 September 1993. Johnson waited thirty to forty-five seconds for Sherika. While Johnson was waiting he noticed a dark, older, dirty car sitting in the driveway. Johnson could not see in the front seat of the car, but he saw two males sitting in the backseat. When Sherika did not appear, Johnson proceeded on his route.

At 7:18 a.m. Kelly Howell of the Forsyth County Sheriff's Department got a call from Emergency Medical Services (EMS). EMS reported a 911 hang-up call from the McCravy residence. Howell called the residence, and a young female answered the phone. Howell testified that the female was polite but somewhat nervous and said that she accidentally hit the speed dial and everything was fine.

While parked in the driveway at the McCravy residence, Shaw saw the screen come out of one of the front windows of the house and then saw Sherika climb out the window and run to the car. Sherika got in the backseat with Carlson and said, "He just shot him. He just shot him. Fred, go in the house." Carlson went toward the front door, with Shaw and Sherika following. As they entered the house, they saw defendant standing in the hallway with a gun in his hand and blood on the floor toward the kitchen and on the door frame. Defendant was yelling, "F— him, f— him. F— that mother-f———." Shaw and Carlson walked to the kitchen and saw the victim lying on the kitchen floor. Defendant yelled, "Make sure this motherf——— is dead!" Defendant then walked over and kicked the victim.

Sherika removed several telephones from the house, and the group left. Shaw got into his own car; and defendant, Carlson, and Sherika got into the victim's Mercedes-Benz. The group went to Albert Walker's house, where defendant told Walker what had occurred. The group, including Walker, disposed of the telephones in a trash bin, returned the victim's automobile to his residence, threw the gun in a local lake, and threw the victim's wallet down the sewer.

During the investigation of the murder, investigators discovered the 911 call; as a result of this information, Sherika gave a statement. Officers then arrested Shaw, who also gave a statement. Detective Gary Thomas arrested defendant and transported him to the Hall of Justice. Detective Thomas advised defendant of his *Miranda* rights and advised him not to make a statement. Upon arrival at the Hall of Justice, Detective Alex Niforos advised defendant of his juvenile rights. Defendant initialed each of his rights; affirmed that he understood them; stated that he did not want a parent, guardian, custodian, or lawyer present; and stated that he wanted to answer questions. At 5:15 p.m. on 30 September 1993, defendant agreed to make a statement. Defendant wrote, "I am not guilty of murder." Niforos told defendant that he knew he was lying because Sherika had told the truth. Upon his request, defendant was permitted to speak with

Sherika. At 6:25 p.m. defendant made another statement, in which he confessed.

Frederick Carlson was arrested later and also made a statement. Carlson and Shaw were charged with first-degree murder and pled guilty to accessory after the fact of murder and felony larceny of an automobile.

Dr. Donald Jason, an expert in forensic pathology, performed an autopsy on the victim on 1 October 1993 and testified that the victim had three bullet wounds. The first bullet wound, which went from the left upper part of the victim's head to the right upper part of the head, was inflicted while the victim was leaning over the washer in the laundry room. The second bullet wound, above the victim's left eyebrow, was inflicted while the victim was in the kitchen, either while the victim was standing or kneeling. The last bullet wound, in the back right part of the head, was inflicted while the victim lay on the floor. Dr. Jason testified that the victim died as a result of the bullet wound over the left eyebrow.

Defendant testified on his own behalf and also presented the testimony of two expert witnesses. David Abernethy, an expert in substance abuse, testified that defendant was alcohol- and cannabis-dependent. Claudia Coleman, an expert in psychology and substance abuse, testified that results from defendant's psychological tests looked "very much like the profile of a young substance abuser or a young addict."

Defendant's account of the murder was substantially similar to that presented by the State. Defendant admitted that he killed the victim but claimed that he did not know what he was doing at the time of the murder because he was under the influence of alcohol. Defendant also testified that after he fired the first shot into the laundry room, he ran into another room and debated whether to pursue the victim into the kitchen or whether to leave. He testified that when he went into the kitchen, he "started talking to [the victim] about why [the victim] didn't like [him]." Defendant also testified that the victim said something to him before the fatal shots, although he cannot remember what he said. Defendant denied kicking or yelling at the victim. Defendant testified that he felt sorry for the victim and himself and that he "wouldn't want to be hunt [sic] down like that," "[l]ike the way I did him."

STATE v. AIKENS

[342 N.C. 567 (1996)]

**[1]** In defendant's first assignments of error, he contends there was insufficient evidence to convict him of first-degree murder on the theory of lying in wait and, therefore, that this theory should not have been submitted to the jury. Specifically, defendant argues that the element of surprise is lacking in this case. Defendant contends that the initial shot in the laundry room that alerted the victim, the time lapse between the first shot and the fatal attack, and defendant's confrontation and conversation with the victim prior to the killing negated the element of surprise. Thus, defendant contends there was insufficient evidence to support a conviction based on the theory of lying in wait. We do not agree.

We have previously set forth the standard for determining a motion to dismiss as follows:

> When a defendant moves for dismissal, the trial court is to determine only whether there is substantial evidence of each essential element of the offense charged and of the defendant being the perpetrator of the offense. Whether evidence presented constitutes substantial evidence is a question of law for the court. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *State v. Smith*, 300 N.C. 71, 78-79, 265 S.E.2d 164, 169 (1980). The term "substantial evidence" simply means "that the evidence must be existing and real, not just seeming or imaginary." *State v. Powell*, 299 N.C. 95, 99, 261 S.E.2d 114, 117 (1980).

*State v. Vause*, 328 N.C. 231, 236, 400 S.E.2d 57, 61 (1991) (citations omitted). In passing upon a defendant's motion to dismiss, the court must consider the evidence in the light most favorable to the State, giving the State the benefit of every reasonable inference. *Id.* at 237, 400 S.E.2d at 61.

Viewed in the light most favorable to the State, the evidence in the instant case was sufficient to support the submission of murder by lying in wait to the jury. In *State v. Camacho*, 337 N.C. 224, 446 S.E.2d 8 (1994), we stated that a defendant commits homicide by lying in wait when he "lies in wait for the victim, that is, waits and watches for the victim in ambush for a private attack on him, [and] intentionally assaults the victim, proximately causing the victim's death." *Id.* at 231, 446 S.E.2d at 12 (citations omitted). In *State v. Allison*, 298 N.C. 135, 257 S.E.2d 417 (1979), we described "lying in wait" as follows:

> [W]hen G.S. 14-17 speaks of murder perpetrated by lying in wait, it refers to a killing where the assassin has stationed himself or is lying in ambush for a private attack upon his victim. An assailant who watches and waits in ambush for his victim is most certainly lying in wait.

*Id.* at 147-48, 257 S.E.2d at 425.

In the instant case defendant went to the victim's home while he was sleeping, armed himself with a loaded gun, and hid in Sherika's bedroom. Defendant remained out of sight while Sherika awakened the victim and told him there was something wrong with the washing machine. Defendant watched for the victim to come out of his bedroom and then followed him as he walked to the laundry room. Defendant shot the victim one time and then ran into another room. Defendant watched through a crack while the victim walked into the kitchen. Defendant remained hidden until he walked in the kitchen and said, "You know it's over now, motherf————." Defendant saw the victim reach for something behind him and ordered the victim to get on the floor. Defendant then shot the victim two more times. Clearly these facts describe "a killing where the assassin has stationed himself or is lying in ambush for a private attack upon his victim," as well as "[a]n assailant who watches and waits in ambush for his victim." *Id.*

Defendant attempts to distinguish this case from previous lying in wait cases based on the victim's awareness that he had been assaulted after the first shot and the interval of time between the first shot and the fatal shot, during which time defendant confronted the victim and they had a verbal exchange. Again we do not agree. As stated in *Allison*:

> [I]t is not necessary that [an assailant] be actually concealed in order to lie in wait. If one places himself in a position to make a private attack upon his victim and assails him at a time when the victim does not know of the assassin's presence or, if he does know, is not aware of his purpose to kill him, the killing would constitute a murder perpetrated by lying in wait. Certainly one who has lain in wait would not lose his status because he was not concealed at the time he shot his victim. The fact that he reveals himself or the victim discovers his presence will not prevent the murder from being perpetrated by lying in wait.

*Id.* at 148, 257 S.E.2d at 425 (citation omitted). In the instant case defendant revealed himself to the victim only after defendant had

shot the victim one time and just prior to shooting the victim two more times. Although the victim was aware that he had been injured after the first shot, he did not know the identity, whereabouts, or intentions of his assailant. Prior to the fatal shots, the victim did not have time to arm himself or to complete a 911 emergency call. Furthermore, defendant testified that prior to entering the kitchen to confront the victim, he "waited around there for like a minute" and wondered whether he should go in the kitchen or leave. "Even a moment's deliberate pause before killing one unaware of the impending assault and consequently 'without opportunity to defend himself' satisfies the definition of murder perpetrated by lying in wait." *State v. Brown*, 320 N.C. 179, 190, 358 S.E.2d 1, 10 (quoting *State v. Wiseman*, 178 N.C. 784, 790, 101 S.E. 629, 631 (1919)), *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987).

We hold that there was sufficient evidence tending to prove each element of first-degree murder by lying in wait and that it was not error to submit this theory of first-degree murder to the jury. These assignments of error are overruled.

[2] In defendant's next assignment of error, he contends that the trial court erred by denying his request for an instruction on voluntary intoxication. Defendant argues that murder perpetrated by lying in wait is a specific-intent offense to which the defense of voluntary intoxication is applicable. This assignment of error is without merit.

We have previously held that "[p]remeditation and deliberation are not elements of the crime of first-degree murder perpetrated by means of lying in wait, nor is a specific intent to kill. The presence or absence of these elements is irrelevant." *State v. Leroux*, 326 N.C. 368, 375, 390 S.E.2d 314, 320, *cert. denied*, 498 U.S. 871, 112 L. Ed. 2d 155 (1990). Defendant argues that while the specific intent to kill is not an element of murder by lying in wait, the crime still involves a specific intent, namely, the intent to "wait." Defendant acknowledges that we previously rejected this argument in *State v. Baldwin*, 330 N.C. 446, 412 S.E.2d 31 (1992); however, defendant requests that *Baldwin* be reexamined.

In *Baldwin* we stated:

[L]ying in wait is a physical act. Like poison, imprisonment, starving, and torture—the other physical acts specified in N.C.G.S. § 14-17—lying in wait is a method employed to kill. It does not require a finding of any specific intent. Because voluntary intoxi-

cation may only be considered as a defense to specific intent crimes, it is therefore irrelevant to a charge of first-degree murder by lying in wait, a crime that does not require a finding of specific intent.

*Id.* at 461-62, 412 S.E.2d at 40-41 (citations omitted). Defendant offers no argument meriting reconsideration of our position on this issue. Thus, this assignment of error is overruled.

[3] By a further assignment of error, defendant contends that the trial court improperly denied his motion to suppress his confession. Defendant contends that his confession should have been suppressed for two reasons: (i) defendant was not informed prior to waiving his rights that he could be tried as an adult, and (ii) defendant should have been rewarned of his juvenile rights prior to making his confession.

Defendant did not assert these issues in his written motion to suppress filed prior to his trial. Similarly, defendant did not raise these issues during the *voir dire* of Detective Niforos. Defense counsel argued only that defendant, prior to his confession, had indicated that he did not wish to be questioned further and that the confession, therefore, should be suppressed. During the *voir dire* defendant also asked the court to determine whether defendant made a "knowing, willing and understanding waiver of his rights" pursuant to N.C.G.S. § 7A-595. The trial court made findings of fact and concluded that defendant "voluntarily, knowingly, willfully, understandingly and voluntarily waived his rights and gave the statement in question" and that none of defendant's constitutional rights were violated.

Defendant raises the two issues before this Court for the first time on appeal. Having failed to attack the admissibility of his confession on these grounds during the trial, defendant may not do so for the first time on appeal. *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988). Moreover, assuming *arguendo* that defendant properly preserved this error for appeal, after a review of the record we find that the trial court's findings of fact are supported by competent evidence and the findings of fact support the trial court's conclusions of law. Therefore, this assignment of error is overruled.

[4] By defendant's final assignment of error, he contends that the trial court improperly instructed the jury pursuant to N.C.G.S. § 15A-1235 when the jury foreperson reported that the jury was deadlocked. This assignment of error is also without merit.

STATE v. AIKENS

[342 N.C. 567 (1996)]

In response to the foreperson's announcement that the jury was deadlocked eleven to one, the trial court gave the following supplemental instruction:

Well, let me preface this by saying that I am certainly in no way trying to coerce you or force you to reach a decision, but let me tell you that it is your duty as jurors to discuss this case, deliberate on it and to keep an open mind and consider the opinions of all the other jurors and, if you can, to reach a unanimous decision if you can do that without the surrender of any conscientious or individual convictions. And that is your duty as a juror. However, no juror should give up his own personal convictions solely for the purpose of reaching a verdict.

We've been in this case all week. It's a fairly long case and maybe two hours and a half is not quite enough deliberation time. So I'm going to let you go back and see if you can reason it over as reasonable men and women and reach a unanimous decision, if you can, without surrendering any individual conscientious convictions. I'm going to let you try just a little more deliberation, but I'm certainly not trying to force you to reach a verdict. But if you'll just go back and talk about it and try to keep an open mind and be reasonable and give every consideration a full and open opportunity and consideration and try a little bit longer. And we'll send for you after a while or you can send a note back. So if you all will step back and resume your deliberations.

Defendant did not object to the court's supplemental instruction, and twenty minutes later the jury returned with a verdict.

Defendant contends that this supplemental instruction did not comply with the statutory requirements of N.C.G.S. § 15A-1235 and thereby coerced a jury verdict in violation of his constitutional rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and Article I, Section 24 of the North Carolina Constitution.

Defendant, relying on *State v. Ashe*, 314 N.C. 28, 331 S.E.2d 652 (1985), contends that he was not required to object to these instructions at trial because failure to comply with a statutory mandate preserves the error for appellate review even absent an objection at trial. Defendant argues that this error is preserved, since "the trial court has a statutory duty under N.C.G.S. § 15A-1235 to instruct in accordance with the statute."

Defendant's reliance on *State v. Ashe* to overcome his failure to object is misplaced. In *Ashe* the Court held that the statute at issue, N.C.G.S. § 15A-1233(a), mandated that the jury be returned to the courtroom and that the trial judge exercise discretion in determining whether to allow the jurors to review evidence previously presented. The trial court's failure to comply with this mandatory statute relieved defendant of his obligation to object in order to preserve the error for review. In the present case the statute at issue, N.C.G.S. § 15A-1235(c), is permissive rather than mandatory. *State v. Williams*, 315 N.C. 310, 326, 338 S.E.2d 75, 85 (1986). Hence, defendant having failed to object to the instruction, our review is to determine whether the error, if any, constituted plain error. *Id.* at 328, 338 S.E.2d at 86.

Section 15A-1235 of the North Carolina General Statutes provides in pertinent part:

(a) Before the jury retires for deliberation, the judge must give an instruction which informs the jury that in order to return a verdict, all 12 jurors must agree to a verdict of guilty or not guilty.

(b) Before the jury retires for deliberation, the judge may give an instruction which informs the jury that:

(1) Jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;

(2) Each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;

(3) In the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and

(4) No juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

(c) If it appears to the judge that the jury has been unable to agree, the judge may require the jury to continue its deliberations and may give or repeat the instructions provided in subsections (a) and (b). The judge may not require or threaten to require the

jury to deliberate for an unreasonable length of time or for unreasonable intervals.

N.C.G.S. § 15A-1235(a)-(c) (1988). Whenever the trial judge gives a deadlocked jury any of the instructions authorized by N.C.G.S. § 15A-1235(b), he must give all of them. *Williams*, 315 N.C. 310, 338 S.E.2d 75. Defendant contends that the trial court's instruction did not contain language tracking subsection 15A-1235(b)(2), which states, "Each juror must decide the case for himself," and subsection 15A-1235(b)(4), which states, "No juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict."

We have previously held that "every variance from the procedures set forth in [N.C.G.S. § 15A-1235] does not require the granting of a new trial." *State v. Peek*, 313 N.C. 266, 271, 328 S.E.2d 249, 253 (1985).

> [I]t has long been the rule in this State that in deciding whether a court's instructions force a verdict or merely serve as a catalyst for further deliberations, an appellate court must consider the circumstances under which the instructions were made and the probable impact of the instructions on the jury.

*Id.* We conclude the trial court's instructions addressed all of the concerns set out in N.C.G.S. § 15A-1235(b)(2) and (b)(4). The trial court advised the jury to "keep an open mind and consider the opinions of all the other jurors and, if you can, to reach a unanimous decision if you can do that without the surrender of any conscientious or individual convictions." The trial court further instructed the jury that "no juror should give up his own personal convictions solely for the purpose of reaching a verdict" and instructed the jury to try to reach a verdict "without surrendering any individual conscientious convictions." Furthermore, the trial court twice assured the jurors that it was not trying to force them to reach a verdict. In *Peek* we stated:

> [A]lthough the instructions do not precisely follow the guidelines set forth in N.C.G.S. § 15A-1235, the essence of the instructions was merely to ask the jury to continue to deliberate. The instructions in no way contained any element of coercion that would warrant a new trial in this matter. Indeed we note that the effect of the instructions was not so coercive as to impel defendant's trial counsel to object to the instructions.

*Id.* at 272, 328 S.E.2d at 253. Similarly, in the instant case, the trial court's instructions were in no way coercive. On the contrary, the trial court repeatedly emphasized to the jurors the importance of their individual convictions. We hold the trial court did not err in its reinstruction. Accordingly, plain error analysis is unnecessary. This assignment of error is overruled.

Having reviewed the trial transcript and defendant's assignments of error, we conclude that defendant received a fair trial free from prejudicial error.

NO ERROR.