IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-214

No. COA20-326

Filed 18 May 2021

Pasquotank County, No. 16 CRS 51973, 18 CRS 36-37

STATE OF NORTH CAROLINA

v.

CHARISSE L. GARRETT, Defendant.

Appeal by Defendant from judgment entered on 12 December 2019 by Judge William A. Wood II in Pasquotank County Superior Court. Heard in the Court of Appeals 10 March 2021.

> *Attorney General Joshua H. Stein, by Assistant Attorney General Lisa B. Finkelstein, for the State.*
>
> *Richard Croutharmel for the Defendant.*

JACKSON, Judge.

The issues in this case are (1) whether a portion of Defendant's indictment was defective for alleging possession of a controlled substance that was not covered under the statute; and (2) whether the trial court improperly influenced a deadlocked jury. We conclude that the trial court committed no error.

## I.    Factual and Procedural Background

The evidence presented at trial tended to show the following. On 31 December

2016, Charisse L. Garrett ("Defendant") was driving from New York to North Carolina when she was pulled over for a traffic violation on Highway 17 in Pasquotank County. Trooper B. Davis of the North Carolina State Highway Patrol had observed Defendant's vehicle swaying back and forth and failing to maintain proper lane control. As Trooper Davis was speaking with Defendant on the side of the roadway, two other agents from the North Carolina State Bureau of Investigation ("SBI") arrived on the scene.

Defendant stepped out of the vehicle, and SBI Officer J. Godfrey used his K-9 narcotics dog to conduct a perimeter search around the exterior of the vehicle. The dog alerted on the driver door and rear of the vehicle. Officers subsequently searched the vehicle, and found in the rear passenger area a shopping bag containing a packet of baby wipes. Inside the packet of baby wipes, officers found a small taped-up package. The package contained a tan powder and a tan hard substance that officers believed to be controlled substances. When asked about the substance, Defendant denied knowledge of it, informing officers that her cousin had handed her the shopping bag in New York and asked her to carry it to a friend in Edenton, North Carolina. Officer K. Johnson of the North Carolina Alcohol Law Enforcement Agency took the substance to the local sheriff's office, weighed it, photographed it, and bagged it. He then personally delivered it to the nearest state crime lab for analysis.

Defendant was arrested and subsequently charged with trafficking heroin by

possession, trafficking heroin by transportation, and maintaining a vehicle for keeping or selling controlled substances. On 29 January 2018, Defendant was indicted by a grand jury in Pasquotank County on charges of trafficking heroin by possession, trafficking heroin by transportation, maintaining a vehicle for keeping or selling controlled substances, trafficking Fentanyl by possession, trafficking Fentanyl by transportation, possession with intent to sell or deliver heroin, and possession with intent to sell or deliver Fentanyl.

¶ 5    On 5 December 2019, Defendant filed a motion to suppress the evidence gathered from the search of her vehicle, arguing that the traffic stop was unsupported by reasonable suspicion. A hearing was conducted on the motion to suppress on 9 December 2019 in Pasquotank County Superior Court. The trial court held that the traffic stop was constitutional and denied Defendant's motion to suppress in an order dated 10 December 2019.

¶ 6    Defendant's trial began on 10 December 2019. During trial, expert testimony was presented by SBI forensic scientist J. Weathers, who had conducted a chemical analysis of the items found in Defendant's car. Ms. Weathers identified the tan powder as 99.17 grams of Fentanyl (a schedule II controlled substance), and identified the tan hard substance as 20.36 grams of heroin (a schedule I controlled substance). Defendant also testified at trial, stating that she had been on her way to a New Years' Eve party in Edenton, North Carolina when she was pulled over. She said that, prior

to leaving New York, her cousin had placed two bags in the rear of her car, with instructions to drop the bags off at a friend's house in Edenton. Defendant testified that she never inspected the bags from her cousin and did not know what they contained.

¶ 7 The defense rested and the trial court denied Defendant's motion to dismiss. During the charge conference, Defendant made no objections to any proposed jury instructions. After the jury charge, the jury deliberated for several hours without reaching a verdict, and were sent home for the evening. The next morning, after the jury deliberated for another hour and 15 minutes, the jury foreperson sent out a note stating that the jury was "undecided on all seven charges." The trial court brought the jury back in and provided an instruction to the jurors regarding their duties to render a verdict. The jury ultimately found Defendant guilty of trafficking heroin by possession, trafficking Fentanyl by possession, possession with intent to sell or deliver heroin, and possession with intent to sell or deliver Fentanyl. The jury found Defendant not guilty on the remaining charges.

¶ 8 The trial court consolidated the charges of trafficking heroin by possession, possession with intent to sell or deliver heroin, and possession with intent to sell or deliver Fentanyl and sentenced defendant at Class E, Prior Record Level II to 90 months minimum and 120 months maximum in prison. On the conviction for trafficking Fentanyl by possession, the trial court sentenced defendant at Class C,

Prior Record Level II to 225 months minimum and 282 months maximum in prison and ordered that sentence to run concurrent to the other sentence. Defendant gave oral notice of appeal in open court.

## II.    Analysis

¶ 9        Defendant raises two arguments on appeal, contending that (1) her indictment for trafficking Fentanyl by possession and possession of Fentanyl with intent to sell or deliver was fatally defective because Fentanyl was not covered by the statute under which she was charged; and (2) the trial court's jury instructions improperly pressured the jury to reach a unanimous verdict when the jury was deadlocked. We conclude that there was no error in either the indictment or the jury instructions.

## A. Indictment

¶ 10        "It is well settled that a valid bill of indictment is essential to the jurisdiction of the trial court to try an accused for a felony." *State v. Abraham*, 338 N.C. 315, 339, 451 S.E.2d 131, 143 (1994) (internals marks and citation omitted). Moreover, "when an indictment is alleged to be facially invalid, thereby depriving the trial court of its jurisdiction, it may be challenged at any time, notwithstanding a defendant's failure to contest its validity in the trial court." *State v. Call*, 353 N.C. 400, 429, 545 S.E.2d 190, 208 (2001) (citation omitted). "The sufficiency of an indictment is a question of law reviewed *de novo*." *State v. White*, 372 N.C. 248, 250, 827 S.E.2d 80, 82 (2019). Here, although Defendant did not challenge the validity of her indictment before the

trial court, she now raises a challenge to the facial validity of the indictment. We accordingly conduct a *de novo* review.

¶ 11    Our General Statutes provide as follows with regard to indictments:

> A criminal pleading must contain . . . [a] plain and concise factual statement in each count which, without allegations of an evidentiary nature, asserts facts supporting every element of a criminal offense and the defendant's commission thereof with sufficient precision clearly to apprise the defendant or defendants of the conduct which is the subject of the accusation.

N.C. Gen. Stat. § 15A-924(a)(5) (2019).

¶ 12    As the statute notes, the "purpose of an indictment is to give a defendant notice of the crime for which he is being charged;" in order to "enable him to prepare his defense" against the charges. *State v. Bowen*, 139 N.C. App. 18, 24, 533 S.E.2d 248, 252 (2000) (internal marks and citation omitted). In order to be facially valid, "[a]n indictment charging a statutory offense must allege all of the essential elements of the offense." *State v. Snyder*, 343 N.C. 61, 65, 468 S.E.2d 221, 224 (1996). "When a defendant has been charged with possession of a controlled substance, the identity of the controlled substance that [the] defendant allegedly possessed is considered to be an essential element which must be alleged properly in the indictment." *State v. Turshizi*, 175 N.C. App. 783, 784-85, 625 S.E.2d 604, 605 (2006).

¶ 13    Defendant here argues that her indictment was facially defective because it alleged that she unlawfully possessed and trafficked Fentanyl—however, at the time

that Defendant was arrested, Fentanyl was not mentioned in the statute under which she was charged. We find Defendant's argument unavailing, because even though Fentanyl was not mentioned by name in the statute, we conclude that the statutory text is broad enough to encompass Fentanyl.

¶ 14    Defendant was charged under N.C. Gen. Stat. § 90-95(h)(4), which (at the time of the offense in December 2016) made it unlawful to possess or transport "four grams or more of opium or opiate, or any salt, compound, derivative, or preparation of opium or opiate (except ampomorphine, nalbuphine, analoxone naltrexone and their respective salts), including heroin, or any mixture containing such substance." N.C. Gen. Stat. § 90-95(h)(4) (2016).

¶ 15    Here, Defendant's indictment listed the offense date as 31 December 2016 and listed the crime committed as "trafficking opium or heroin . . . in violation of N.C.G.S. § 90-95(h)(4)." The indictment then read as follows:

> I. The jurors for the State upon their oath present that on or about the date shown above and in the county named above, the defendant unlawfully, willfully and feloniously did transport 28 grams or more of Fentanyl.
>
> II. The jurors for the State upon their oath present that on or about the date shown above and in the county named above, the defendant unlawfully, willfully and feloniously did possess 28 grams or more of Fentanyl.

¶ 16    The issue is that while the indictment accuses Defendant of possessing and transporting Fentanyl, the statute under which she was charged does not specifically

mention Fentanyl as one of the prohibited substances. The question before us thus becomes whether Fentanyl is covered by the more general language of the statute— i.e., whether Fentanyl qualifies as an "opium or opiate, or any salt, compound, derivative, or preparation of opium or opiate" within the meaning of the statute as it was written in 2016. N.C. Gen. Stat. § 90-95(h)(4) (2016). We hold that Fentanyl does indeed qualify as an opiate within the meaning of the statute.

¶ 17    We begin our analysis with a general explanation of the differences between opium, opioids, and opiates. "Opium" is a natural substance extracted from the unripe seed pods of the opium poppy, *papaver somniferum*.[1] "Opiates" are typically defined as natural analgesic drugs derived from opium, including "natural opioids such as heroin, morphine, and codeine," which bind to certain receptors in the central nervous system to reduce the intensity of pain signals, induce sedation, calmness, or euphoria.[2] In contrast, synthetic opioids are a category of drugs that are either partially or wholly synthetic, produced in a lab in order to mimic the effects of opium.[3]

---

[1] *Opium,* Encyclopedia Britannica (2021) ("Opium, narcotic drug that is obtained from the unripe seedpods of the opium poppy (*papaver somniferum*), a plant of the family Papaveraceae.")

[2] *Opium,* Encyclopedia Britannica (2021) ("Opium and the drugs obtained from it are called opiates."); *Commonly Used Terms*, Opioid Overdose, Centers for Disease Control and Prevention, 26 January 2021, https://www.cdc.gov/drugoverdose/opioids/terms.html ("Opiates refer to natural opioids such as heroin, morphine and codeine."); *Opiate*, Merriam-Webster Dictionary (2021).

[3] *What are synthetic opioids like fentanyl?*, Drug Policy Alliance, https://drugpolicy.org/what-are-synthetic-opioids-fentanyl. ("Synthetic opioids refer to a

Fentanyl is usually considered to be a synthetic opioid, as it is wholly manmade with no natural components.[4] Finally, "opioid" is most commonly used as an umbrella term to refer to "all natural, semisynthetic, and synthetic opioids."[5]

¶ 18 However, these definitions are not universal—as noted by the State, there is significant variation and overlap in the definitions of the term "opiate" and "opioid," and different sources define these terms with varying levels of specificity. The State contends that the legislature intended for "opiate" to encompass any drug that produces an opium-like effect by binding to opiate receptors in the brain—which would include both drugs naturally derived from opium (such as morphine) as well as synthetic and semi-synthetic drugs (such as Fentanyl). On this point we agree

category of novel psychoactive substances (NPS) that are either known to be opiates or have opiate-like effects. These are not naturally occurring substances, although they have effects related to the naturally occurring drugs from several species of the opium poppy plant."); Destiny Bezrutczyk & Theresa Parisi, *What are Synthetic Opioids*?, The Addiction Center, 29 March 2021, https://www.addictioncenter.com/opiates/synthetic-opioids/ ("Synthetic opioids are a class of drug that are manufactured in laboratories and designed to have a chemical structure which is similar to opiates naturally derived from the opium poppy.").

[4] *Glossary of Terms*, Johns Hopkins Medicine, 12 February 2018, https://www.hopkinsmedicine.org/news/articles/glossary-of-terms ("Fentanyl: A fully synthetic opioid, 100 times more powerful than morphine."); *State v. Locklear*, 261 N.C. App. 309, 817 S.E.2d 799, 2018 WL 4201067, at *2 (2018) (unpublished) (describing "fentanyl" as "a synthetic opioid").

[5] *Commonly Used Terms*, Opioid Overdose, Centers for Disease Control and Prevention, 26 January 2021, https://www.cdc.gov/drugoverdose/opioids/terms.html ("Opioids refer to all natural, semisynthetic, and synthetic opioids."); Leah Miller, Sarah Hardey, & Ryan Kelley, *Opiates vs Opioids: What's the Difference*?, American Addiction Centers, 30 March 2021, https://americanaddictioncenters.org/opiates ("Opioid is an umbrella term that includes natural opioids, semi-synthetic opioids derived from natural opioids, and synthetic opioids created in a laboratory.").

with the State that the legislature intended for this broader definition of "opiate" to apply to § 90-95(h)(4), and that Fentanyl accordingly qualifies as an opiate.

¶ 19     First, we note that this broader definition of "opiate" is supported by the common dictionary definition of the term. *See Dickson v. Rucho*, 366 N.C. 332, 342, 737 S.E.2d 362, 370 (2013) ("In the absence of a contextual definition, courts may look to dictionaries to determine the ordinary meaning of words within a statute.") (citation omitted). The entry for "opiate" in the Merriam-Webster Dictionary provides as follows:

> A. an alkaloid drug (such as morphine or codeine) that contains or is derived from opium, binds to cell receptors primarily in the central nervous system and gastrointestinal tract, acts to block pain, induce sedation or sleep, depress respiration, and produce calmness or euphoria, and is associated with physiological tolerance, physical and psychological dependence, and addiction upon repeated or prolonged use.

> B. a synthetic or semisynthetic drug (*such as fentanyl* or methadone) or an endogenous substance (such as beta-endorphin) that binds to opiate cell receptors and produces physiological effects like those of opium derivatives: [see also] OPIOID sense 1

*Opiate*, <u>Merriam-Webster Dictionary</u> (2021) (emphasis added).

¶ 20     In addition to the being consistent with the dictionary definition, this broader definition of "opiate" is also supported by the statutory definition of "opiate" found within Chapter 90. *See State v. Boykin*, 853 S.E.2d 781, 785 (N.C. Ct. App. 2020)

("Where . . . the statute, itself, contains a definition of a word used therein, that definition controls, however contrary to the ordinary meaning of the word it may be.") (internal marks and citation omitted). At the time of the offense in December 2016, the definitions portion of Article 5, Chapter 90 (the North Carolina Controlled Substances Act) defined an "opiate" as "any substance having an addiction-forming or addiction-sustaining liability similar to morphine or being capable of conversion into a drug having addiction-forming or addiction-sustaining liability." N.C. Gen. Stat. § 90-87(18) (2016). We hold that Fentanyl falls within this definition. It is a highly addictive substance that produces effects that are similar to those of morphine by acting on the opiate cell receptors in the brain.

¶ 21    Finally, Defendant argues that her proposed definition of an "opiate"—i.e., as only those substances naturally derived from the opium plant—is supported by the subsequent legislative history of the statute. She points out that § 90-95(h)(4) was amended in 2018 (two years after Defendant's indictment) to specifically add "opioids" as one of the prohibited substances under the statute. *See* S.L. 2018-44 § 7 (removing "opium or opiate" and replacing this language with "opium, opiate, or opioid"). Defendant maintains that if there truly were no difference between opioids and opiates, then there would have been no need for the legislature to amend this statute just to add the word "opioid."

¶ 22    We disagree. A subsequent amendment to a statute can indicate "that the

legislature intended either (a) to change the substance of the original act, or (b) to clarify the meaning of it." *Childers v. Parker's, Inc.*, 274 N.C. 256, 260, 162 S.E.2d 481, 483 (1968) (citation omitted). "When the legislature amends an ambiguous statute, the presumption is not that its intent was to change the original act, but merely to clarify that which was previously doubtful." *Town of Hazelwood v. Town of Waynesville*, 320 N.C. 89, 95, 357 S.E.2d 686, 689 (1987) (internal marks and citation omitted). "Even the action of the legislature in amending a statute so as to make it directly applicable to a particular case is not a conclusive admission that it did not originally cover such a case." *Childers*, 274 N.C. at 260, 162 S.E.2d at 484 (internal marks and citation omitted).

¶ 23        Here, the meaning of the term "opiate" as used in § 90-95(h)(4) in 2016 was ambiguous, as it was susceptible to more than one reasonable interpretation. In 2018, the General Assembly responded to the significant level of variation and overlap in the definitions of the term "opiate" and "opioid" by enacting Session Law 2018-44 to clarify that opium, opiates, and opioids were all prohibited substances. Accordingly, we hold that the legislature's amendment of § 90-95(h)(4) was intended to clarify rather than alter the meaning of this term, and to clarify the scope of the substances covered by the statute.

¶ 24        In conclusion, because Fentanyl qualified as an opiate under N.C. Gen. Stat. § 90-95(h)(4), it was illegal to possess or traffic in Fentanyl under this statute at the

time of the offense in 2016. Defendant was thus properly charged and convicted for

trafficking and possession of Fentanyl under this statute, and her indictment was not

defective.

**B. Jury Instructions**

Defendant next argues that the trial court committed plain error in instructing

the deadlocked jury. We disagree.

When a defendant fails to object to a jury instruction at trial (as Defendant did

here), this Court conducts plain error review. *See* N.C. R. App. P. 10(a)(4); *State v.*

*Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983).

> For error to constitute plain error, a defendant must
> demonstrate that a fundamental error occurred at trial. To
> show that an error was fundamental, a defendant must
> establish prejudice—that, after examination of the entire
> record, the error had a probable impact on the jury's
> finding that the defendant was guilty. Moreover,
> because plain error is to be applied cautiously and only in
> the exceptional case, the error will often be one that
> seriously affects the fairness, integrity or public reputation
> of judicial proceedings.

*State v. Lawrence*, 365 N.C. 506, 518, 723 S.E.2d 326, 334 (2012) (internal marks and

citations omitted).

Here, Defendant challenges the instructions provided by the trial court to the

jury on the second day of deliberations. After approximately six and a half hours of

deliberations that continued into a second day, the jury foreperson sent a note to the

trial court. The note stated that "We the jury of the State of NC vs Charisse L. Garrett . . . are not in agreement with guilty or not guilty. Verdict – undecided on all seven charges." The trial court then brought the jury back into the courtroom in order to remind them "what their duties are as jurors and their obligations and send them back out." The trial court instructed the jury as follows:

> In response to this letter, I would like you to listen to the following. Ladies and gentlemen, I have received a note that indicates you're unable to reach a verdict. I know what we are asking you to do is difficult, asking 12 people that do not know each other for the most part to reach a unanimous verdict on [a] matter of this importance. It's not easy.
>
> I would like to remind you that when you were selected to be on the jury these attorneys carefully considered your qualifications. After doing so, they decided that the 12 of you were the best suited to hear this case and render a verdict reflecting the truth. I want to remind you that it is your duty to do whatever you can without surrendering an honest conviction as to the effect or weight of the evidence to reach a unanimous decision. You should reason this over as reasonable men and women and do everything possible to reconcile your differences. In getting back to work, no juror should change his verdict simply to reach a verdict, however, do not hesitate to re-examine your own views and change your opinion, if you become convinced it is erroneous.

¶ 28   Defendant contends that this instruction was improper because it failed to recite the language from N.C. Gen. Stat. § 15A-1235(b) (the statute which describes how a judge should instruct a deadlocked jury). We disagree and hold that the

instructions were proper because they communicated all of the core ideas contained in the statute and did not contain any misstatements of law.

¶ 29        When a trial court instructs a jury regarding their inability to reach a verdict, "a charge which might reasonably be construed by a juror as requiring him to surrender his well-founded convictions or judgments to the views of the majority is erroneous." *State v. Alston*, 294 N.C. 577, 593, 243 S.E.2d 354, 364 (1978). In order to aid trial courts in instructing undecided juries, the legislature enacted N.C. Gen. Stat. § 15A-1235(b), which is "now the proper reference for standards applicable to charges which may be given a jury that is apparently unable to agree upon a verdict." *State v. Easterling*, 300 N.C. 594, 608, 268 S.E.2d 800, 809 (1980). The statute provides as follows:

> (b) Before the jury retires for deliberation, the judge may give an instruction which informs the jury that:
>
>> (1) Jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to individual judgment;
>>
>> (2) Each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;
>>
>> (3) In the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous; and
>>
>> (4) No juror should surrender his honest conviction as to the weight or effect of the evidence solely

because of the opinion of his fellow jurors, or for the
mere purpose of returning a verdict.

N.C. Gen. Stat. § 15A-1235(b) (2019).

¶ 30    Our Supreme Court has previously upheld a trial court's instructions under this statute when "the trial court's instructions addressed all of the concerns set out in [the statute]," even though the trial court did not recite the statutory language verbatim. *State v. Aikens*, 342 N.C. 567, 579, 467 S.E.2d 99, 107 (1996). *See also State v. Peek*, 313 N.C. 266, 272, 328 S.E.2d 249, 253 (1985) (upholding trial court's instructions to an undecided jury because "the essence of the instructions" was correct, "although the instructions [did] not precisely follow the guidelines set forth in N.C.G.S. § 15A-1235"); *State v. Lane*, 253 N.C. App. 239, 798 S.E.2d 437, 2017 WL 1381643, at *7 (2017) (unpublished) ("[T]he trial judge is not required to recite instructions verbatim from the statute.").

¶ 31    Here, we likewise conclude that the trial court did not err because it provided the jury with the key essence of the instructions from N.C. Gen. Stat. § 15A-1235(b) after the jury indicated that it was undecided in its deliberations. Below, the language from the statute is compared side-by-side with the corresponding rough-equivalent instructions from the trial court (in italics):

| | |
|---|---|
| (1) Jurors have a duty to consult with one another and to deliberate with a view to reaching an agreement, if it can be done without violence to | *"I want to remind you that it is your duty to do whatever you can without surrendering an honest conviction as to the effect or weight of the evidence to* |

individual judgment;

2) Each juror must decide the case for himself, but only after an impartial consideration of the evidence with his fellow jurors;

3) In the course of deliberations, a juror should not hesitate to reexamine his own views and change his opinion if convinced it is erroneous;

4) No juror should surrender his honest conviction as to the weight or effect of the evidence solely because of the opinion of his fellow jurors, or for the mere purpose of returning a verdict.

*reach a unanimous decision."*

*"You should reason this over as reasonable men and women and do everything possible to reconcile your differences."*

*"However, do not hesitate to re-examine your own views and change your opinion, if you become convinced it is erroneous."*

*"In getting back to work, no juror should change his verdict simply to reach a verdict."*

¶ 39 We believe this comparison demonstrates that the instructions given by the trial court contained all of the key elements and ideas from § 15A-1235(b), even though the trial court did not follow the statutory language word-for-word. Accordingly, the jury was properly instructed with regard to their duty to deliberate, and Defendant cannot demonstrate plain error.

## III.   Conclusion

¶ 40 Defendant has not demonstrated any error in the indictment or the jury instructions.

NO ERROR.

Judges ZACHARY and WOOD concur.